*Hussain Ali Zadeh v. State of Maryland*
No. 11, Sept. Term 2022
Opinion by Leahy, J.

**Criminal Procedure > Motions to Suppress > Maryland Rule 4-252 > Timeliness**

Maryland Rule 4-252 governs the filing of mandatory motions, including motions to suppress evidence obtained from an illegal search or seizure, in criminal cases. Subsection (b) of the Rule provides that such mandatory motions "shall be filed within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court pursuant to Rule 4-213(c)[.]" Here, after his prior conviction for second-degree murder was reversed on appeal and remanded for a new trial, Zadeh filed a motion to suppress cell-site location information obtained through a court order issued pursuant to the Maryland Stored Communications Act based on new law articulated in *Carpenter v. United States*, 138 S. Ct. 2206 (2018). Zadeh's motion was denied on the grounds that it was filed outside the 30-day deadline specified in Maryland Rule 4-252(b) and there was no good cause to excuse the lack of timeliness.

We hold that, given the purpose of Rule 4-252(b) and the inconsistent impact on parties that would follow application of the 30-day clock on remand for a new trial, the 30-day clock for filing mandatory motions does not reset on remand for a new trial following the reversal or vacatur of a conviction. That does not mean, of course, that motions to suppress may be filed at any time or that Rule 4-252 generally does not apply on remand. Instead, on remand, a trial court can impose a reasonable deadline in a new scheduling order. Otherwise, the court, in its discretion, may take into consideration all of the circumstances, including the date on which trial is scheduled, good cause for any delay, and prejudice to the State. We conclude that Zadeh's motion was timely because it was filed nearly three months before the scheduled trial date (and 10 months before the trial actually began on September 28, 2021), and the trial judge did not articulate any prejudice that would inure to the State by considering the motion. The trial court's mistake, therefore, was in *reapplying* Rule 4-252(b)'s 30-day deadline to the appearance of Zadeh's new counsel filed more than five years after the litigation began.

**Criminal Procedure > Exclusionary Rule > Fourth Amendment Violation > Good Faith Exception**

Before the suppression court, the State argued that, on the merits, Zadeh's motion to suppress should be denied because the good faith exception to the exclusionary rule applied. Although the circuit court did not reach the merits, we shall address them as they have been preserved by the parties' extensive briefing and argument before the trial court and this Court. Applying *Carpenter*, we first conclude that the court order through which law enforcement obtained Zadeh's CSLI data (the "August 7 Order") did not constitute a proper warrant and therefore violated the Fourth Amendment.

Nonetheless, we also conclude, applying both *Illinois v. Krull*, 480 U.S. 340 (1987), and *United States v. Leon*, 468 U.S. 897 (1984), that the officer, Det. Wolff, acted in good faith in obtaining Zadeh's historical CSLI. First, under *Krull*, we hold that an officer in Det. Wolff's position at the time he applied for the August 7 Order (prior to *Carpenter*) could have reasonably relied on the validity of the Maryland Stored Communications Act, which has never been declared unconstitutional. Second, in our analysis under *Leon*, we hold that, although the order was void *ab initio* because it was signed by a district court judge—rather than a circuit court judge as required by the statute—we cannot agree that a reasonable officer would have known that the order was so facially deficient as to preclude any reasonable reliance upon it. The ambiguity in the statute as to the meaning of "court of competent jurisdiction" was sufficiently confusing among the bench and bar that the Maryland Attorney General had to issue an opinion explaining that "a court of competent jurisdiction under . . . the stored communications statute means a circuit court." *See* 101 Md. Op. Att'y Gen. 61 (Md. A.G. Aug. 30, 2016). Accordingly, Det. Wolff reasonably relied upon the district court's ultimately mistaken determination that it possessed the authority to issue the order. We therefore hold that suppression of the CSLI data was not warranted and affirm the circuit court's decision to deny Zadeh's motion to suppress.

**Criminal Procedure > Voluntariness of Defendant's Statements > Common Law Voluntariness > Jury Instruction**

At trial, and over Zadeh's objection, the State played a recording of a lengthy discussion between Zadeh and two police officers who went to Zadeh's place of employment to execute a search warrant for Zadeh's DNA and cell phone. During that interview, Zadeh made several inculpatory statements. Zadeh's prior motion to suppress these statements was denied. At trial, Zadeh requested that the jury be instructed with a pattern instruction regarding the voluntariness of a defendant's statements to law enforcement. Zadeh's request was denied, and his objection was noted on the record.

Considering the very low bar imposed by the "some evidence" standard, and the principle that it is within the province of the jury to determine whether a defendant's statement to law enforcement was voluntarily given, irrespective of the court's preliminary decision, we must conclude that the trial court abused its discretion by failing to give the requested pattern jury instruction, or as in *Covel v. State*, ___Md. App. ___ (2023), No. 1094, Sept. Term 2021, slip. op. at 6, a modified voluntariness instruction. Zadeh's request to give a voluntariness instruction should have been granted because "some evidence" was presented at trial sufficient to generate the instruction when viewed under the totality of the circumstances. Here, the trial court focused only on the absence of "evidence that there is force, promises, threats, inducements, or offer of reward[.]" We conclude the court improperly removed the question of voluntariness from the jury's consideration despite "some evidence" from which a jury could infer that Zadeh's statements were not voluntarily given.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

No. 0011

September Term, 2022

_____

HUSSAIN ALI ZADEH

v.

STATE OF MARYLAND

_____

Leahy,
Zic,
Ripken,

JJ.

_____

Opinion by Leahy, J.

_____

Filed: June 29, 2023

\*\*Tang, J., and Albright, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

*In the November 8, 2022, general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

The case involving the love-triangle and the murder of Cecil Brown ("Brown") returns to us following the retrial of Hussain Ali Zadeh ("Zadeh").

Just after noon on August 4, 2014, Takoma Park Police responded to a call reporting a woman screaming at the home located at 805 Colby Avenue. When the police arrived, they found Brown's deceased body face-down in the backyard and bleeding from apparent blunt force trauma to the back of his head. Brown's wife, Larlane Pannell-Brown ("Pannell-Brown"), quickly became a suspect after detectives learned that Pannell-Brown was having an affair with a man twenty-years younger named "Ali" who worked at the nearby Enterprise Rental Car. Later that day, detectives spoke with Ali Zadeh, who denied any involvement in Brown's murder. Through the course of the investigation, however, detectives obtained evidence that Pannell-Brown and Zadeh were romantically and financially involved.

In March 2017, Zadeh and Pannell-Brown were tried together as co-defendants before a jury in the Circuit Court for Montgomery County, Maryland. Both were convicted of second-degree murder but acquitted of first-degree murder and conspiracy to commit murder. On appeal, we reversed Zadeh's conviction for second-degree murder, holding, among other things, that Zadeh was unfairly prejudiced when he was tried together with Pannell-Brown.[1] *See Pannell-Brown et al. v. State*, Nos. 1065 & 1329, Sept. Term 2017,

---

[1] We affirmed Pannell-Brown's conviction for second-degree murder. *See Pannell-Brown et al. v. State*, Nos. 1065 & 1329, Sept. Term 2017, slip op. at 30-31 (filed Feb. 26, 2019).

1

slip op. at 44-45 (filed Feb. 26, 2019).  On April 3, 2020, the Supreme Court of Maryland[2] affirmed our decision reversing Zadeh's conviction and remanded for a new trial.  *See State v. Zadeh*, 468 Md. 124, 163-64 (2020).

A jury convicted Zadeh of second-degree murder at the conclusion of his second trial on November 18, 2021.  Several months later, the court sentenced Zadeh to 30 years with credit for time served and subsequently denied his motion for a new trial.

Zadeh filed a timely appeal on March 3, 2022, and presents the following five questions for our review:

I. Did the trial court err in denying Zadeh's motion to suppress cell-site location information collected from his cell phone as untimely?

II. Did the trial court err in engaging in *ex parte* communications with the jury without apprising Zadeh of those communications or seeking his input?

III. Did the trial court err in denying Zadeh's request to provide Maryland Criminal Pattern Jury Instruction 3:18 concerning the voluntariness of Zadeh's statement to the police?

IV. Did the trial court err in admitting evidence and argument concerning premeditation and conspiracy in violation of Zadeh's double jeopardy rights?

V. Did the trial court err in denying Zadeh's motion for a judgment of acquittal, finding sufficient evidence to support the conviction?

We must reverse the judgment in this case because the trial court erred in denying Zadeh's request to give Criminal Pattern Jury Instruction 3:18 regarding the voluntariness

---

[2] During the November 8, 2022, general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.  *See also* Md. Rule 1-101.1(a).

of a defendant's statements to law enforcement. Considering the very low bar imposed by the "some evidence" standard for generating a jury instruction, together with the principle that it is within the province of the jury to determine whether a defendant's statement to law enforcement was voluntarily given, we conclude that the trial court erred in failing to give any voluntariness instruction. We reach the remaining issues, except Zadeh's second question, to guide further proceedings on remand.

This opinion is divided into two parts. We address Zadeh's first question separately, in Part I, because it raises several distinct substantive and procedural issues before the suppression court. Ultimately, we hold that the trial court did not err in denying Zadeh's motion, relying on new law articulated in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), to suppress historical cell-site-location-information ("CSLI") that Takoma Park Police had obtained pursuant to a court order issued several days after the murder on August 7, 2014 ("August 7 Order"). Contrary to the suppression court, however, we arrive at this determination by way of the good faith exception to the exclusionary rule, rather than because Zadeh's motion to suppress was untimely. We hold that the 30-day filing requirement contained within Maryland Rule 4-252(b) does not apply to motions to suppress on remand for a new trial following the reversal or vacatur of a conviction. Considering the plain text of the rule, we conclude that strict application of the 30-day deadline cannot apply in that context because there is no uniform point from which the 30-day clock can reset following reversal on appeal.

In Part II, we examine Zadeh's challenges to the trial court's rulings during his second jury trial, including the only issue on which we reverse concerning the voluntariness

3

instruction. We hold that Zadeh's double jeopardy rights were not violated when the court admitted evidence and argument of premeditation and conspiracy because the same evidence also supported a conviction for second-degree murder. Finally, we hold that there was sufficient evidence to support Zadeh's conviction for second-degree murder.

## PART I

### A. BACKGROUND

The court anchored its denial of the suppression motion on its untimeliness under Rule 4-252(b), despite agreeing with Zadeh that the August 7 Order was "void *ab initio*" because it was issued by the district court rather than the circuit court as required by section 10-401(12) of the Maryland Code (1973, 2020 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP"). Maryland Rule 4-252(b) provides that mandatory motions, including those that address "[a]n unlawful search [or] seizure" under 4-252(a), "shall be filed within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court pursuant to Rule 4-213(c)[.]"

Zadeh challenges the trial court's denial of his motion to suppress on the following grounds: (1) Maryland Rule 4-252 does not apply to retrials; (2) the motion to suppress is properly considered a supplement to Zadeh's original omnibus motion; and (3) even if Rule 4-252 applies, the court erred in declining to find that "good cause" existed to overcome the lateness of the filing. The State disagrees and contends that even if the motion to suppress was timely, the CSLI evidence should not be suppressed because the police relied on the court order in good faith.

4

Our summary of the relevant facts is drawn solely from the facts and information in the record before the suppression court. *Longshore v. State*, 399 Md. 486, 498 (2007).

### 1.    Procedural History Leading to Second Trial

On May 28, 2015, Zadeh and Pannell-Brown were arrested and later indicted on charges of first-degree murder and conspiracy to commit the murder of Cecil Brown. On July 31, 2015, defense counsel appeared before the Circuit Court for Montgomery County to hear the statement of charges against Zadeh.

On August 5, 2015, Zadeh's counsel filed a general omnibus motion pursuant to Maryland Rule 4-252, alleging, among other things, that "[a]ny search and seizure in this case was not pursuant to a valid warrant or any recognized exception to the warrant requirement" and requesting "[s]uppression of any evidence which is the product or fruit of any unlawful search, seizure, or interception of wire or oral communication." That same day, defense counsel also filed a motion to suppress evidence specifying that Zadeh sought suppression of "All other Evidence and Testimony" obtained as a result of "an illegal arrest or search and seizure conducted in violation of the common law of Maryland, the Fourth and Fourteenth Amendments" and "the Maryland Declaration of Rights." Neither motion, however, identified any illegal search or seizure or specific evidence to be suppressed.

After obtaining specially admitted out-of-state counsel from Williams & Connolly, LLP, Zadeh filed a motion to sever, which was denied. Beginning on March 20, 2017, Zadeh was tried with Pannell-Brown as his co-defendant on charges of first-degree murder and conspiracy to commit murder. The jury was also presented with second-degree murder as a lesser-included offense. The jury found Zadeh guilty of second-degree murder and

acquitted him of both first-degree murder and conspiracy to commit murder. Zadeh appealed, and on February 26, 2019, we reversed Zadeh's conviction for second-degree murder, holding that Zadeh and Pannell-Brown should have been tried separately because the cumulative effect of the non-mutually admissible evidence unfairly prejudiced Zadeh. *See Pannell-Brown et al. v. State*, Nos. 1065 & 1329, Sept. Term 2017, slip op. at 44-45 (filed Feb. 26, 2019). As mentioned above, the Supreme Court of Maryland affirmed our decision reversing Zadeh's conviction and the case was remanded to the circuit court. *State v. Zadeh*, 468 Md. 124, 163-64 (2020).

## 2. Pre-trial Motions on Remand

The circuit court received the Supreme Court's mandate on June 17, 2020. The week before, on June 12, 2020, three different attorneys from Williams & Connolly, LLP, entered their appearances in the circuit court on behalf of Zadeh. A status conference was held on July 15, 2020, during which the court set the new trial date for March 8, 2021. The court also directed the parties to file any motions *in limine* by February 5, 2021 and preset a motions hearing for February 19, 2021. A scheduling order with these operative dates was then entered on the docket.

Approximately two months before the scheduled motions hearing, on December 21, 2020, Zadeh moved to suppress the CSLI data for his phone number ending in 1365, arguing that the police obtained the data from Verizon as the product of a warrantless search under *Carpenter v. United States*, 138 S. Ct. 2206 (2018). The record provides the following information regarding the CSLI data that Zadeh sought to suppress.

6

*August 7 Order Issued by District Court*

On August 7, 2014, Takoma Park Police Detective Gregory Wolff went to the District Court for Montgomery County, Maryland, and applied for a court order. The application reflects that Det. Wolff requested the "capture of historical geographic location information from the cellular telephone having the number [ending in 1365] . . . and subscribed to [Zadeh]." In support of the application, Det. Wolff affirmed that "the location information likely to be obtained is relevant to the . . . ongoing criminal investigation" into Brown's murder. Attached to the application was a five-plus-page summary of the investigation that served as the basis for requesting the order. In particular, Det. Wolff averred that, after they were dispatched to the scene of the murder, Takoma Park investigators became aware that Pannell-Brown was having an affair with Zadeh. He further related that: (1) over the course of several interviews, both Pannell-Brown and Zadeh gave contradictory or false answers as to the nature of their relationship; (2) Pannell-Brown and Zadeh had spoken over the phone on the morning of the murder; and (3) Zadeh had wiped his phone clean after police asked him about his communications with Pannell-Brown. The application requested an order directing, among other things:

- That Verizon provide "historic geographic location information" for Zadeh's phone ending in 1365 "for the time period[] August 1st[,] 2014 until August 6th, 2014 with subscriber and billing information";

- That Verizon and "every and all other telecommunication carriers and/or providers of wire or electronic communication services" be compensated at the mutually-agreed upon rates "pursuant to the Annotated Code of Maryland, Courts and Judicial Proceeding[s Article], 10-4A-07[.]"[3]

---

[3] The statute referenced in the application is the Maryland Stored Wire and Electronic Communications and Transactional Records Access Act ("Stored

7

The order was signed by a district court judge, and beneath the signature line on the order, the word "Circuit" was crossed out and replaced with the word "District" handwritten next to it.[4]  On August 11, 2014, in response to the August 7 Order, Det. Wolff received the CSLI data from Verizon.  This data included several types of historical location information, with estimated distances to the nearest phone tower.

### *August 11 Search Warrant Issued by Circuit Court*

On August 11, 2014, Det. Wolff also applied for and obtained a search warrant issued by the Circuit Court for Montgomery County for much of the same CSLI data, as

---

Communications Act"), currently codified at  CJP §§ 10-4A-01 to 10-4A-08.  In August 2014, under a prior version of the Act, *see* Md. Code (1973, 2013 Repl. Vol.), CJP §§ 10-4A-01 to 10-4A-08, law enforcement could apply for either a court order *or* a search warrant to compel a service provider to disclose electronic communications. CJP §§ 10-4A-04(a), (b)(1).  The Act distinguished the data that revealed the "content" of a communication—such as text messages—from data that revealed only "record or other information."  CJP § 10-4A-04(b)(1)(i).

Law enforcement  could obtain CSLI data in one of two ways.  First, if the officer sought the content of a communication, the service provider could disclose that content "only in accordance with a search warrant issued by *a court of competent jurisdiction*" unless notice was first provided to the customer (in which case a court order would suffice).  CJP §§ 10-4A-04(a)(1), (b)(1)(i)-(ii) (emphasis added).  Alternatively, if the information requested was only "record or other information," a "court of competent jurisdiction" could "issue an order requiring disclosure" if "the investigative or law enforcement officer shows that there is reason to believe the contents of a wire or electronic communication, or the records or other information sought, are relevant to a legitimate law enforcement inquiry."  CJP §§ 10-4A-04(d)(1), (c)(2)(ii)(3).

[4] On August 7, 2014, the State's Attorney's Office for Montgomery County, Maryland also moved "to seal the Affidavit in the Court Order issued on this 7th day of August, 2014, by **Judge JOHNSON**" for a period of 30 days.  (Emphasis in original).  A corresponding order was entered by the Honorable Robert Greenberg granting the motion to seal the affidavit on August 11, 2014, upon the court's finding that "good cause exists to order that the Court Order and its Affidavit be sealed[.]"

well as "[a]ny and all text message[s] . . . sent and received" between August 1 through August 11, 2014. Much like the application for the August 7 Order, the search warrant application contained an affirmation page and a summary of events. Det. Wolff received the CSLI data from the August 11 Search Warrant on August 20, 2014. The second production, like the first, included several types of location information, but with significantly fewer data points for the date of the murder as compared to the data obtained under the August 7 Order. Unlike the first production, the second production included the contents of certain text messages.

### *September 28, 2021, Hearing on Motion to Suppress*

As noted, on December 21, 2020, Zadeh moved to suppress the CSLI data obtained from Verizon pursuant to the August 7 Order. Zadeh argued that "the State's acquisition of historical cell-site location records using the August 7 Order constituted a warrantless search" based on new law articulated in *Carpenter v. United States*, 138 S. Ct. 2206 (2018). Zadeh also contended that suppression of the evidence was required because the good faith exception was inapplicable for two reasons. First, the August 7 application and order did not comply with the Stored Communications Act because it was issued by a district court judge, rather than a circuit court judge, and was therefore "void *ab initio*." Second, Det. Wolff's application for the court order failed to meet the probable cause requirement because "[n]othing in the . . . application establishes a link between Brown's murder and purported CSLI" for Zadeh's phone. On January 14, 2021, the State filed a memorandum opposing Zadeh's motion to suppress, arguing, among other things, that the motion to

9

suppress was untimely because it was filed "six months after current counsel's entry of appearance" in violation of the timing requirements of Maryland Rule 4-252(b).

At the suppression hearing, which was held on September 28, 2021, after two COVID-19-related postponements, the court agreed with Zadeh that the August 7 Order issued by the district court was void *ab initio*. Still, the court denied Zadeh's motion to suppress on timeliness grounds, declining to find that good cause existed to overcome the lateness of the motion. The court reasoned:

> I think it[']s conceded that under the wiretap statute that this particular kind of order has to be signed by a circuit court judge and not a district court judge.[5]
>
> * * *
>
> [A]lthough the application [for the August 7 Order] had a heading of circuit court, it was actually signed by a district court judge who simply crossed out circuit and wrote district, and signed the order. So, at that point, under the very terms of the statute, under [CJP § ]10-405, the information that was obtained at that time was obtained in violation of this section, and therefore, would be inadmissible at trial if objected to.
>
> And, so, under [Maryland Rule] 4-252, . . . that information would have been an unlawful search, seizure, or interception of wire or oral communications; and, therefore, . . . **there would be a requirement that the**

---

[5] The trial court's reference to the wiretap statute is incorrect but may be explained by the following cross-reference in the Stored Communications Act. Specifically, CJP § 10-4A-01(b)(12) provides that the term "[j]udge of competent jurisdiction" has the same meaning as stated in the Wiretapping and Electronic Surveillance Act ("Wiretap Act") under Maryland Code (1973, 2020 Repl. Vol.), CJP § 10-401. Under CJP § 10-401(12), a "'[j]udge of competent jurisdiction' means a judge of **any circuit court within the State** having jurisdiction over the offense under investigation." (Emphasis added). In 2016, the Maryland Attorney General issued an opinion explaining that the term "court of competent jurisdiction"—empowered to issue an order requiring the production of "record or other information" under CJP § 10-4A-04—has the same meaning as "judge of competent jurisdiction" and "means a circuit court." *See* 101 Md. Op. Att'y Gen. 61 (Md. A.G. Aug. 30, 2016).

**motion to suppress that information that was obtained in violation of the wiretap statute be filed within 30 days of the appearance of counsel or the appearance of the defendant. That was not done; it was never even raised or discussed during the first trial.**

So, now, on remand, Defense is raising [] this <u>Carpenter</u> case that occurred in 2018 as a basis for constitutional suppression, as opposed to statutory or suppression based upon the statutory language**. And, therefore, that also would be a mandatory motion in Circuit Court, and, therefore, would need to be filed within 30 days of the first appearance of the defendant or counsel in this case; that was not done either.**

**And, so, there was actually two bases for them to file it, and neither one of which was filed in a timely way.** There's been not even an offer of the reason why this was done that would justify good cause to be found by the Court. It's not a situation where new law was issued after they had entered their appearance. It's not a situation where new discovery or belated discovery raised the issue. This issue has been there for seven years, as of today six years when they entered their appearance.

**So, clearly, this motion would be a mandatory motion in Circuit Court and the requirement is to be filed within 30 days**, and there's been no offer of the basis for why it wasn't done, and, therefore, I'm unable to find good cause for the failure to have done so. (Emphasis added).

On November 8, 2021—the first day of trial—the court heard arguments on Zadeh's motion to reconsider the court's denial of his motion to suppress. Defense counsel argued that similar to the *Hicks* rule, Rule 4-252(b) "does not speak to retrials" and therefore the motion was timely because "there's no new 30-day period upon entrance of a new attorney." Also, defense counsel argued the court erred in ruling that Zadeh could have moved to suppress the CSLI data on statutory grounds because it was obtained under the Stored Communications Act, which "does not have a statutory remedy requiring exclusion

11

of evidence."[6]  Finally, defense counsel concluded that, even if the motion to suppress was untimely, "good cause" existed to review the motion on its merits.

The State countered that the motion was untimely under Rule 4-252 and, even if it was timely, the good faith exception to the exclusionary rule applied because Det. Wolff "believed he was in the correct court because a judge who is skilled in the law, signed off on this order, [and] handed it back to him."  The court denied the motion for reconsideration, holding that:

> [I]t's pretty clear under the law that on a retrial, the mandatory motions must be filed, and therefore, I think that under **[Maryland Rule] 4-252(b), where it has to be filed within 30 days after the earl[ier] appearance of counsel or the first appearance of the defendant, then under [Maryland Rule] 4-213(c),** that that rule would apply. There is no other rule that deal[s] with retrials, I'm not aware of any of the other criminal rules that apply to retrials.
>
> So, it's clear that the motions in this case were not filed within that 30-day period and from the record that was presented earlier at the motions hearing and today, **I don't believe that there's any good cause to extend the deadline.**  (Emphasis added).

When defense counsel asked the court to clarify when exactly the 30-day period began and ended in this retrial, the court responded: "Well, I would say that you would follow the rule, . . . [the] [f]irst appearance of the counsel or first appearance of the defendant before the Court, pursuant to Rule 4-213(c)[.]"

---

[6] The Stored Communications Act provides only for a civil remedy of damages for "a knowing or intentional violation of this subtitle[.]"  CJP § 10-4A-08(a).

12

## B.     DISCUSSION

## MOTION TO SUPPRESS CSLI DATA

### 1.     Parties' Contentions

Before this Court, Zadeh argues, first, that his motion to suppress was timely because the 30-day time limitation for filing mandatory motions contained in Maryland Rule 4-252 does not apply to retrials. The plain text of the Rule, he urges, does not address that contingency. Furthermore, he notes, the application of the 30-day rule in the context of a retrial is unsupported by caselaw. Zadeh asks us to view this situation as analogous to the *Hicks* rule—as presented in Maryland Rule 4-271—which uses "***identical language*** to govern the calculation of the 180-day rule for trial and has been held ***not*** to apply on retrial." (Emphasis supplied by Zadeh).

From there, Zadeh recycles more of the arguments presented below, including: (1) the motion to suppress was supplemental to his timely-filed omnibus motion filed on August 5, 2015; (2) the court erred in declining to find that "good cause" existed for a late filing under Rule 4-252(a) based on new law articulated in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), which held that law enforcement must get a warrant to obtain an individual's historical CSLI data; and (3) the court's reliance on the exclusion remedy under section 10-405 of the Wiretap Act was erroneous as the August 7 Order was issued pursuant to the Stored Communications Act, which "does not provide any remedy requiring courts to exclude evidence obtained by law enforcement officers who fail to comply with the act." (Quoting *Upshur v. State*, 208 Md. App. 383, 399 (2012)). Finally, Zadeh claims

13

that the State suffered no prejudice and "had notice and the opportunity to defend against Zadeh's motion for ***nearly one year***[.]" (Emphasis supplied by Zadeh).

The State advances a contrary interpretation of the 30-day requirement under Rule 4-252(b), arguing that it applies in this case because, as articulated in *Hammersla v. State*, 184 Md. App. 295, 313 (2009), "[a] conviction reversal 'with an order for a new trial, "wipe[s] the slate clean," and the case [begins] anew procedurally.'" Quoting *Gantt v. State*, 73 Md. App. 701, 704 (1988), the State posits that "the case returns to the 'stage . . . at which any pretrial motions could be filed and resolved[,]'" meaning that Zadeh's "new period for filing motions began when the [Supreme] Court [] remanded [his] case in April 2020."

Next, the State avers that Zadeh waived his suppression claim during the first trial and again, after remand, before the retrial. In the same way that the defendant in *Carpenter* challenged the unconstitutional activity there, the State says, "Zadeh could have challenged the allegedly unconstitutional activity here" and that regardless "the issuance of *Carpenter* in 2018 does not explain why Zadeh waited until December 2020 to file his suppression motion—eight months after his convictions were reversed."

The State rebuffs Zadeh's contention that the motion to suppress was supplemental to the omnibus motion filed back in 2015, pointing out that the omnibus motion did not reference any facts or points of authority in support of Zadeh's CSLI suppression claim and therefore could not satisfy the requirements of Rule 4-252(e).

Finally, even though the trial court did not reach the merits of the motion to suppress, the State urges that Zadeh's suppression claim lacks merit for two reasons. First,

14

relying on *Whittington v. State*, 474 Md. 1, 25 (2021), the State asserts that Zadeh's challenge to the August 7 Order addresses form over substance because the order met the constitutional requirements for a warrant as it was issued under Maryland Code (2001, 2018 Repl. Vol., 2021 Supp.), Criminal Procedure Article ("CP"), § 1-203.1, which the State avers, "governs the collection of CSLI[,]" and includes the district court in its definition of a "Court" having jurisdiction to issue an order. Second, the State contends that the police relied on the order in good faith, and, quoting *State v. Faulkner*, 190 Md. App. 37, 60 (2010), highlights that, "'evidence seized under a warrant subsequently determined to be invalid may be admissible if the executing officers acted in objective good faith with reasonable reliance on the warrant.'"

Zadeh replies that the August 7 Order did not meet the requirements of a warrant because (1) the order was facially invalid because it was signed by a district court judge, and (2) the issuing court made no finding of probable cause because the Stored Communications Act does not require probable cause. Zadeh emphasizes that just like the federal analogue at issue in *Carpenter*, the Stored Communications Act has a lower relevance standard, which Zadeh contends—citing *Andrews v. State*, 227 Md. App. 350, 411 (2016)—"falls far short of the particularity required to support a search warrant." Zadeh drives back the State's argument that the August 7 Order was issued under CP § 1-203.1, pointing out that the statute took effect on October 1, 2014—almost two months after the August 7 Order was issued. Finally, in response to the State's good faith argument, Zadeh posits that under *Illinois v. Krull*, 480 U.S. 340 (1987), the order here

15

does not fall within the good faith exception because it failed to "satisf[y] the [Stored Communications Act's] then-lawful requirements" as it was invalidly issued.

## 2.    Standard of Review

We review the circuit court's compliance with the Maryland Rules without deference and "adhere to the familiar principles of statutory interpretation." *State v. Graves*, 447 Md. 230, 240 (2016) (citations omitted). As such, we "begin with the normal, plain reading" of the Rule. *State v. Bey*, 452 Md. 255, 265 (2017) (quoting *State v. Johnson*, 415 Md. 413, 421-22 (2010)). If that language "is unambiguous and clearly consistent with the [Rule's] apparent purpose, our inquiry" ordinarily ends and we apply the Rule "as written without resort to other rules of construction." *Id.* As we do when interpreting statutes, we look to harmonize rules that apply to the same subject matter and "try to avoid interpretations that defy common sense or are otherwise illogical or unreasonable." *Huggins v. State*, 479 Md. 433, 442 (2022) (cleaned up).

We make an independent, *de novo*, appraisal of whether a constitutional right has been violated by applying the law to the facts presented in a particular case. *Whittington v. State*, 474 Md. 1, 20 (2021); *State v. Andrews*, 227 Md. App. 350, 371 (2016).

## 3.    Timeliness of Motion to Suppress

### *Maryland Rule 4-252*

Maryland Rule 4-252 governs the filing of mandatory motions in criminal cases. The relevant provisions of the Rule in this case are:

> **(a) Mandatory Motions.** In the circuit court, the following matters shall be raised by motion in conformity with this Rule and if not so raised are waived unless the court, for good cause shown, orders otherwise:

16

(3) An unlawful search, seizure, interception of wire or oral communication, or pretrial identification;

\* \* \*

**(b) Time for Filing Mandatory Motions**. A motion under section (a) of this Rule shall be filed within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court pursuant to Rule 4-213(c), except when discovery discloses the basis for a motion, the motion may be filed within five days after the discovery is furnished.

\* \* \*

**(e) Content.** A motion filed pursuant to this Rule shall be in writing unless the court otherwise directs, shall state the grounds upon which it is made, and shall set forth the relief sought. A motion alleging an illegal source of information as the basis for probable cause must be supported by precise and specific factual averments. Every motion shall contain or be accompanied by a statement of points and citations of authorities.

\* \* \*

**(h) Effect of Determination of Certain Motions.**
\* \* \*
(2) *Suppression of Evidence*.
\* \* \*
(C) If the court denies a motion to suppress evidence, the ruling is binding at the trial unless the court, on the motion of a defendant and in the exercise of its discretion, grants a supplemental hearing or a hearing de novo and rules otherwise. A pretrial ruling denying the motion to suppress is reviewable on a motion for a new trial or on appeal of a conviction.

Md. Rule 4-252 (bold emphasis in original).

The purpose of Rule 4-252 is to effectuate "the orderly resolution of suppression motions." *Sinclair v. State*, 444 Md. 16, 28 (2015). "A defendant claiming an unlawful search and seizure must file a pretrial motion in conformity with this Rule," and "the failure to do so results in a waiver of the issue." *Huggins*, 479 Md. at 444 (citing Rule 4-252(a)(3), (g)(1)). Prejudice to the State is a key consideration as the Rule "is [] designed to facilitate

17

the fair consideration of a suppression motion in advance of trial." *Sinclair*, 444 Md. at 29; *see also Denicolis v. State*, 378 Md. 646, 660 (2003).

The party to benefit from the motion to suppress bears the burden of demonstrating either that the motion was timely or that good cause exists to excuse the lack of timeliness. *See Jones v. State*, 42 Md. App. 209, 214 (1979). As noted, the Rule's clock begins "30 days after the ***earlier*** of the appearance of counsel or the ***first*** appearance of the defendant before the court[.]" Md. Rule 4-252(b) (emphasis added).

Whether the Rule's 30-day requirement to file mandatory motions applies anew in the case of a reversal on appeal with an order for a new trial is not stated in the Rule. A plain reading of the Rule's language suggests that it applies only one time—after the earlier appearance of counsel or the first appearance of the defendant. Although the issue does not appear to have been addressed directly in our jurisprudence, we can distill certain precepts from our caselaw that aid in our analysis.

Our cases instruct that, following a mistrial or remand for a new trial, the parties' pretrial procedural obligations are renewed. *See Odum v. State*, 156 Md. App. 184, 210, (2004) ("At a new trial, a defendant may always file a new motion to suppress, and if the State opposes it, a defendant, in appropriate circumstances may avail himself of 'the law of the case' principles. *Otherwise, it is a new motion, new hearing, new trial, and new decision*.") (emphasis in original) (quoting *Southern v. State*, 371 Md. 93, 110 (2002)). Indeed, we have explained that a "reversal of [a defendant's] conviction, with an order for a new trial, '**wipe[s] the slate clean,' and the case beg[ins] anew procedurally**." *Hammersla v. State*, 184 Md. App. 295, 313 (2009) (emphasis added).

18

In the main, Rule 4-252 applies to new trials. In *Channer v. State*, for example, we pointed to the trial court's discretion, as codified in Rule 4-252(h)(2),[7] to reconsider the merits of a motion to suppress that was denied in a previous trial. 94 Md. App. 356 (1993). There, prior to the defendant's first trial, defense counsel timely moved under Rule 4-252 to suppress the defendant's statements made to police. *Id.* at 361. During the suppression hearing, the detective testified that he found Mr. Channer in a bedroom and "that [Mr. Channer] indicated that he wanted to talk[,]" more specifically, "to 'come clean.'" *Id.* The two went into a bathroom to speak privately, and before any statements were made, the detective advised Mr. Channer of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Defense counsel argued that Mr. Channer's "come clean" statement was the byproduct of an "interrogation without *Miranda*" and should have been suppressed; the trial court denied the motion. *Id.* at 361-62.

After the first trial ended in a mistrial, defense counsel withdrew from the case and was replaced by new counsel. *Id.* at 362. New counsel moved to suppress the defendant's statements—presumably in timely fashion given that there was no discussion on the timeliness of the motion. *Channer*, 95 Md. App. at 362. The trial court agreed to suppress the "come clean" statement but refused to reconsider the admissibility of the statements

---

[7] In 1993, what is now codified as Rule 4-252(h)(2)—delineating the circuit court's authority to address motions to suppress that have been previously decided—was codified as Rule 4-252(g)(2). Currently, under subsection 4-252(h)(2)(A), the Rule addresses the trial court's authority to reconsider, on motion filed by the State before trial, a motion to suppress that had earlier been granted by the court. The Rule also addresses the trial court's authority to reconsider, on motion filed by the defendant, a motion to suppress that was earlier denied, specifying that "[a] pretrial ruling denying the motion to suppress is reviewable on a motion for a new trial or on appeal of a conviction." Rule 4-252(h)(2)(C).

which came *after* that point. *Id.* In affirming the court's decision not to address the admissibility of the statements made thereafter in the bathroom, we held that:

> The voluntariness of the statement made in the bathroom was first raised by replacement counsel at the start of the second trial, and the court properly exercised its direction in refusing to consider it. **The fact that a mistrial was declared at the close of the first trial did not nullify the pretrial hearing on the motion to suppress. "When such a motion has been fully heard and considered and there is no new evidence which was unavailable at the first hearing, the trial judge may exercise his discretion and bind himself by the prior ruling**…." *Cf.* Md. Rule 4-252[(h)](2) (a trial court has discretion to permit or deny a hearing *de novo* on a motion to suppress evidence that was denied prior to retrial).

*Id.* at 363-64 (emphasis added) (cleaned up).

In *Marshall v. State*, we clarified that, after the grant of a new trial, the trial court retains discretion not to entertain newly raised motions that fail to comply with the particularity requirements of Rule 4-252(e). 213 Md. App. 532 (2013). In *Marshall*, the defendant was initially tried and convicted of several offenses. *Id.* at 536. The defendant filed a motion for a new trial, based on juror misconduct, which was granted on September 10, 2010. *Id.* Prior to his first trial, the defendant had filed a motion to dismiss the charge of gang participation on constitutional grounds. *Id*. at 550. Following the grant of a new trial, however, he did not reassert his motion to dismiss when he filed his Rule 4-252 pretrial motions, as he did prior to the first trial. *Id.* at 550-51. On appeal, Marshall argued that he raised the issue of the gang participation statute's constitutionality in his renewed Rule 4-252 omnibus motion, which stated simply: "All charges against this Defendant be dismissed for that there are defects in the institution of the prosecution and in the charging documents." *Id.* at 551. Similarly, in his "Motions Pursuant to MD 4-252 & 4-253[,]" he

broadly alleged that "there is a constitutional or statutory defect in the institution of the prosecution in this case." *Marshall*, 213 Md. App. at 551. We concluded that there was "no evidence that Marshall renewed his motion to dismiss the gang charges based on the constitutionality of the statute[,]" and "[i]f Marshall's omnibus motion was an attempt to do so, it failed to comply with the requirements of Md. Rule 4-252(e)" due to its reliance on those bald legal conclusions. *Id.* at 554. Accordingly, we held that Marshall waived his motion to dismiss on retrial for failing to properly reassert it. *Id.*

Our caselaw establishes that a timely-filed Rule 4-252 motion which does not comply with the particularity requirements of Rule 4-252(e) may not be rescued, ordinarily, by a supplemental motion filed past the operative deadline without good cause. In *Denicolis v. State*, the Supreme Court of Maryland explained:

> It has apparently become the practice for some defense counsel to file this kind of motion, seeking a panoply of relief based on bald, conclusory allegations devoid of any articulated factual or legal underpinning, presumably in the belief that if the motion complies with the time requirements of Rule 4-252(b), compliance with Rule 4-252(e) is unnecessary. That is not the case. **If a motion fails to provide either a factual or legal basis for granting the requested relief, it cannot be granted.** Recognizing the time constraints under which defense counsel and *pro se* defendants often operate, however, some courts have routinely overlooked the impermissible generality of such motions and have permitted the defendant to make the complaint more specific at, or in preparation for, a hearing on the motion. **Although that practice is not what the Rule anticipates and is not to be encouraged, we have not disturbed the discretion of the trial courts to permit defendants to supplement unsupported allegations in the motion at or before the hearing, at least where the State is not unduly prejudiced** by being called upon to respond immediately to allegations of which it had no prior notice.

378 Md. 646, 660 (2003) (emphasis added). *See also Sinclair v. State*, 444 Md. 16, 34-36 (2015) (finding that motion was waived due to lack of timeliness because Rule 4-252 "will

21

have been completely defeated" if parties were permitted to "file a bare bones motion that provides no notice as to the evidence it seeks to suppress or the reasons for doing so" and then supplement that motion on the first day of trial.).

*Analysis*

We agree with Zadeh's contention that the 30-day mandatory filing deadline contained in Rule 4-252(b) does not apply to retrials. As noted, in determining that Zadeh's motion was untimely, the trial court explained that when a case is remanded for a new trial "you would follow the rule" and the 30-day clock resets upon the "[f]irst appearance of the counsel or first appearance of the defendant before the court, pursuant to Rule 4-213(c)[.]" In practice, however, and in the broader context of the Maryland Rules governing criminal procedure, enforcing the 30-day time limitation on parties after a case is reversed and remanded for a new trial would be unreasonable because it would lead to anomalous results. *Huggins v. State*, 479 Md. 433, 442 (2022) (holding that courts "try to avoid interpretations that defy common sense or are otherwise illogical or unreasonable") (cleaned up).

To start, we consider the first possible anchoring point for re-starting the 30-day clock: the appearance of defense counsel. As a clarifying point, we observe that the "appearance" of counsel does not mean the first point at which counsel is physically present before the trial court. Rather, it refers to counsel's entry of appearance on the record "by filing a pleading or motion or by filing a written notice of appearance" in the circuit court. Md. Rule 4-214(a). The Rule contemplates that the appearance of defense counsel occurs during the initial stage of a criminal prosecution. Specifically, pursuant to Rule 4-214,

22

counsel "shall enter an appearance within five days after accepting employment, after appointment, or after the filing of the charging document in court, whichever occurs later." Md. Rule 4-214(a). That clear mandate provides an obvious and uniform starting point for the 30-day clock during an initial proceeding.

In *Allen v. State*, this Court clarified that "appearance of counsel," as the phrase appears in Rule 4-252(b), refers to the appearance of a defendant's first attorney. 91 Md. App. 775, 780 (1992), *overruled on other grounds by Stratemeyer v. State*, 107 Md. App. 420 (1995). "The later appearance of other counsel does not revive the 30–day period in which to file [] a [mandatory] motion." *Id.* Although in *Allen* the clarification was addressed to the defendant's argument that his motion to suppress was timely filed because his second counsel filed it contemporaneously with the entry of his appearance—well after the 30-day deadline—the logic of the ruling extends to any "latter appearance" of counsel after a mistrial or after a case is reversed on appeal and remanded for a new trial. *Id.* This is because, among other reasons, the continuation or termination of counsel's initial entry of appearance becomes more complicated in the event of a reversal on appeal. Under Rule 8-402(b), an "appearance of an attorney entered in a lower court shall continue in the [Appellate Court of Maryland] and the [Supreme Court of Maryland]" unless, among other reasons, "the attorney's appearance has automatically terminated pursuant to section (g) of this Rule." Md. Rule 8-402(b). In turn, Rule 8-402(g) provides that the "appearance of an attorney entered in the lower court is automatically terminated upon the entry of an appearance by the Public Defender or an attorney designated by the Public Defender." Md. Rule 8-402(g).

23

We observe that there are varying circumstances under which a defendant's trial counsel may—or may not—re-enter their appearance after a case is reversed and remanded for a new trial. Here, we identify just three:

(1) The defendant is represented by private defense counsel at trial, but by the Public Defender on appeal. In this scenario, Rule 8-402(g) would operate to terminate trial counsel's appearance in the lower court. Upon reversal, the private trial counsel would presumably be required to enter a new appearance.

(2) The defendant is represented by private defense counsel at trial and on appeal. In this case, Rule 8-402(g) would not apply and defense counsel's appearance would continue both in the lower court and the appellate courts. Following reversal of the defendant's convictions, entering a new appearance would not be necessary for the same trial counsel.

(3) The defendant is represented by private defense counsel for the first trial, but by different private counsel (including, as in this case, from the same law firm) for the second trial. New trial counsel is obligated to enter an initial appearance.

Other examples may abound. Still, these examples illustrate the uneven consequences of applying Rule 4-252(b)'s 30-day time limitation to the "[f]irst appearance of the counsel or first appearance of the defendant before the court" in the context of a retrial. As we have noted, the purpose of the rule is to promote uniformity and sufficient notice "to facilitate the fair consideration of a suppression motion in advance of trial." *Sinclair*, 444 Md. at 29. That purpose is ill-served by a rule which would apply to some defendants, but not to others, depending on their arrangements for representation.

The same reasoning applies to the second possible anchoring point: the first appearance of the defendant before the trial court. Rule 4-252(b) makes plain that the "first appearance of the defendant" refers to the defendant's initial appearance before the court

24

"pursuant to Rule 4-213(c)"—*i.e.*, the first appearance at which the defendant is informed of the formal charges or appears by written notice of counsel in response to a summons issued under Rule 4-212(b). Indeed, Rule 4-213(c) provides that the "initial appearance of the defendant in circuit court occurs when the defendant (1) is brought before the court by reason of execution of a warrant pursuant to [Rule 2-412] or (2) appears in person or by written notice of counsel in response to a summons." Md. Rule 4-213(c). Again, with regard to a defendant's first trial, the date of the defendant's first appearance provides a clear and uniform point from which the 30-day clock begins to run. However, the 30-day starting point prior to a retrial—or a new trial following reversal on appeal—is not readily identifiable for the simple reason that the defendant would not necessarily have another "first appearance . . . before the court pursuant to Rule 4-213(c)." Md. Rule 4-252(b). As we have previously explained, a criminal prosecution generally consists of five stages: "(1) the accusatory stage resulting in the filing of the indictment, (2) the stage at which any pretrial motions could be filed and resolved, (3) the actual trial on the merits of guilt or innocence, (4) the filing of the State's Attorney's notice of intention to proceed under mandatory sentencing procedures, and (5) the sentencing hearing itself." *Hammersla v. State*, 184 Md. App. 295, 311 (2009). When an appellate court finds reversible error and remands for further proceedings, the case only resets to the stage at which the error occurred and all preceding stages which were free from error remain in full effect. *Id.* (citing *Gantt v. State*, 73 Md. App. 701, 704 (1988)). Thus, when reversible error occurs in the pretrial motions stage, repeating stage one (*i.e.*, the accusatory stage during which the arraignment and the defendant's first appearance occur) is unnecessary absent error

25

stemming from that stage of the proceedings. Without that discrete event, there is no point from which the 30-day clock can reset following remand upon the first appearance of the defendant "pursuant to Rule 4-213(c)." Md. Rule 4-252(b).

In addition to the awkward mechanics of applying Rule 4-252(b)'s 30-day requirement in the context of a retrial, we consider Zadeh's *Hicks* analogy to be apt. As Zadeh points out, we have consistently held that Maryland Rule 4-271 (commonly known as the *Hicks* rule) does not apply to retrials. *Icgoren v. State*, 103 Md. App. 407, 415-17 (1995). We note that Rule 4-271 employs language identical to that contained in Rule 4-252(b). Specifically, Rule 4-271 provides that "[t]he date for trial in the circuit court shall be set within 30 days **after the earlier of the appearance of counsel or the first appearance of the defendant before the circuit court pursuant to Rule 4-213**, and shall be not later than 180 days after the earlier of those events." Md. Rule 4-271(a)(1) (emphasis added). The uniform language of Rules 4-271(a) and 4-252(b) reflects how they work in tandem to oversee the orderly administration of a case within the initial 180-day timeline. Since trial must commence within the relatively short 180-day timeframe mandated by Rule 4-271, Rule 4-252(b)'s 30-day rule for filing of mandatory motions serves the complementary purpose of ensuring the resolution of such motions in advance of trial. When the 180-day timeframe falls away in the context of a retrial, the logic underlying the 30-day rule is likewise eroded.

Accordingly, given the purpose of Rule 4-252(b) and the inconsistent impact on parties that would follow application of the 30-day clock on remand for a new trial, we hold that the 30-day clock for filing mandatory motions does not reset on remand for a new

26

trial following the reversal or vacatur of a conviction. That does not mean, of course, that motions to suppress may be filed at any time or that Rule 4-252 generally does not apply on remand. For example, a motion to suppress filed in the setting of a retrial must comply with the particularity requirements of Rule 4-252(e). *Marshall*, 213 Md. App. at 554 (defendant's omnibus motion pursuant to Rule 4-252 "failed to comply with the requirements of Md. Rule 4-252(e)" in asserting a challenge to constitutionality of gang participation charge on retrial). Also, Rule 4-252(a) continues to hold the issue of an illegal search and seizure as waived if not timely raised unless the court orders otherwise upon a showing of "good cause." Md. Rule 4-252(a). And in *Channer*, we highlighted that, under Rule 4-252(h)(2)(C), the court may bind itself to its prior ruling when there is no new evidence or caselaw and the issue could have been raised previously. *Channer*, 94 Md. App. at 363-64. In that scenario, prior to a retrial, a new motion to suppress that was not raised prior to the first trial in accordance with Rule 4-252 may be considered waived, unless new evidence or intervening precedent supports the motion, not because the 30-day clock under Rule 4-252(b) resets, but because the underlying bases for suppression could and should have been raised within the *initial* 30-day filing period in the first trial under Rule 4-252(b).[8] Our holding today does not alter these precepts.

---

[8] Additionally, when the erroneous denial of a motion to suppress is reversed on appeal and the case is remanded for a new trial in an opinion that does not "contain any express directions for the scope of proceedings on remand[,]" the trial court may consider issues not foreclosed by law of the case principles. *Tu v. State*, 336 Md. 406, 420 (1994). Accordingly, the defendant may file a new motion to suppress and the trial court may, in ruling on the motion, reconsider "the admissibility of the State's evidence that was the subject of the suppression motion, at least if the reconsideration presents a legal theory that

27

Instead, on remand, a trial court can impose a reasonable deadline for filing motions to suppress in a new scheduling order. Otherwise, the court, in its discretion, may take into consideration all of the circumstances, including the date on which trial is scheduled, good cause for any delay, and prejudice to the State. *See Edmund v. State*, 398 Md. 562, 569 (2007) (approving trial court's decision to address the merits of the petitioner's Rule 4-252 motion where "there was no sandbagging of the State," which had an opportunity to respond in advance of the motions hearing); *Davis v. State*, 100 Md. App. 369, 386 (1994) (finding that good cause existed to excuse late filing where appellant was involuntarily without counsel during the relevant filing period); *Sinclair*, 444 Md. at 35-36 (finding waiver where counsel attempted to raise grounds for motion to suppress on the first day of trial without any showing of good cause).

Returning to the case before us, we conclude that the trial court abused its discretion in denying Zadeh's motion to suppress on the ground that it was untimely under Rule 4-252(b)'s 30-day deadline. As noted, following remand in this case, a status hearing was held on July 15, 2020, during which the court scheduled the retrial for March 8, 2021, directed the parties to file any motions *in limine* by February 5, 2021, and set a motions hearing for February 19, 2021. The court then confirmed those dates in its scheduling order docketed July 29, 2020. Then, well before the February motions hearing, on December 21,

---

was not ruled upon on the prior appeal" as well as any "facts that are relevant to applying that previously unadjudicated legal theory and that were not previously presented[.]" *Id.*

28

2020, Zadeh moved to suppress the CSLI data collected from his phone as the product of a warrantless search under *Carpenter v. United States*, 138 S. Ct. 2206 (2018).[9]

We recognize that a motion *in limine* is not equivalent to a motion to suppress, which normally, a "party must make . . . before trial under pain of waiver." KENNETH S. BROUN, ET AL., MCCORMICK ON EVIDENCE § 52 (Robert P. Mosteller, et al., eds., 8th ed. 2022). To be sure, "[a]s the plain meaning of its text confirms, Rule 4-252 applies to issues that do not lend themselves to quick, on the spot rulings[.]" *Huggins*, 479 Md. at 445. But here, Zadeh's motion to suppress CSLI evidence was filed nearly three months before the scheduled trial date (and 10 months before the trial actually began on September 28, 2021), and the trial judge did not articulate any prejudice that would inure to the State by considering the motion. The record shows that the State had ample opportunity to respond to Zadeh's motion to suppress, given that its position was fully briefed and presented to the trial court at the eventual motions hearing.

At the motions hearing, the trial court focused on whether Zadeh had articulated good cause to file the motion *beyond the 30-day deadline* in Rule 4-252(b), rather than good cause to file the motion when he did. Certainly, had the court set a deadline for filing mandatory motions following remand, Zadeh would have had the burden to show good

---

[9] We do not agree with the State's argument that "Maryland law before *Carpenter* did not prevent Zadeh from raising a Fourth Amendment challenge" during his first trial. Although Zadeh certainly could have attempted to suppress the CSLI data on that basis, the denial of his motion would have likely been a *fait accompli*. Indeed, the Supreme Court of Maryland, in surveying this area of the law in 2017 (*i.e.*, pre-*Carpenter*), noted that "[m]ost courts have concluded that law enforcement access to historical CSLI is not a search for purposes of the Fourth Amendment" due to application of the third-party doctrine. *State v. Copes*, 454 Md. 581, 611 (2017).

cause if he had missed that deadline. *See Allen*, 91 Md. App. at 780-81. The trial court's mistake, therefore, was in *reapplying* Rule 4-252(b)'s 30-day deadline to the appearance of Zadeh's new counsel filed more than five years after the litigation began. Though we recognize that the matter of determining the timeliness of Zadeh's motion was within the court's discretion, the court's mistaken preconception that the 30-day deadline applied rendered its ultimate decision an abuse of discretion because "when an otherwise discretionary decision is premised upon legal error, that decision is necessarily an abuse of discretion because 'the court's discretion is always tempered by the requirement that the court correctly apply the law applicable to the case.'" *Bass v. State*, 206 Md. App. 1, 11 (2012) (quoting *Arrington v. State*, 411 Md. 524, 552 (2009)).[10]

In sum, we hold that the 30-day deadline for filing mandatory motions contained in Rule 4-252(b) does not reset on remand for a new trial following the reversal or vacatur of a conviction because there is no uniform point to which the 30-day clock may be tethered. Our holding does not suggest that motions to suppress may be filed at any time or that Rule 4-252 and other rules and precepts governing pretrial procedures do not apply on remand.

---

[10] We agree with the State that Zadeh's generic omnibus motion filed by prior counsel more than five years earlier could not satisfy the requirements of Rule 4-252(e), and that the trial court was well within its discretion in declining to treat the motion to suppress as supplemental to that omnibus motion. The Supreme Court explained in *Denicolis v. State* that such motions fail to meet the particularity requirements under Rule 4-252 and discouraged trial courts from exercising their discretion to relax the standards, emphasizing that "[i]f a motion fails to provide either a factual or legal basis for granting the requested relief, it cannot be granted." 378 Md. at 660; *see also Sinclair*, 444 Md. at 35-36 (providing that the purpose of Rule 4-252 would be defeated if counsel were permitted to sandbag the State by filing a barebones omnibus motion and later supplementing the motion shortly before trial). That remains true in the event of a retrial.

Normally, in the event of a retrial, it is within the trial court's discretion to set a mandatory motions deadline within a reasonable time or to decide the timeliness of a motion to suppress by taking into account all of the circumstances, including the date on which trial is scheduled, good cause, and prejudice to the State.

### 4. The Order Failed to Meet the Requirements of a Warrant, But the Good Faith Exception Applies

Having determined that Zadeh's motion to suppress was timely, we shall address the merits which have been preserved by the parties' extensive briefing and argument before the trial court. *See* Md. Rule 8-131(a). Zadeh's motion was well-supported by argument (thus satisfying Rule 4-252(e)) and was predicated on an argument that would not have stood a reasonable chance of success in his first trial because the United States Supreme Court had not yet decided the *Carpenter* case.[11]

Before we turn to the good faith exception, we must address the antecedent question concerning the constitutionality of the August 7 Order under the Fourth Amendment. Applying the guidelines articulated in *Richardson v. State*, 481 Md. 423 (2022), and *Whittington v. State*, 474 Md. 1 (2021), we hold that the August 7 Order did not meet the

---

[11] We agree with the trial court's alternative conclusion that Zadeh's argument regarding the validity of the August 7 Order under the terms of the Stored Communications Act could have been raised during the first trial. However, as Zadeh ably points out, we have previously explained that the Stored Communications Act "does not provide any remedy requiring courts to exclude evidence obtained by law enforcement officers who fail to comply with the act." *Upshur v. State*, 208 Md. App. 383, 399 (2012). Regardless, Zadeh discusses the August 7 Order in the context of the *Krull* exception to the exclusionary rule in responding to the State's contentions regarding the good faith exception. In that sense, Zadeh's statutory argument is derivative of his *Carpenter* argument, which only became available *after* his first trial.

31

requirements of a warrant. From here, we apply *Carpenter v. United States*, 138 S. Ct. 2206, 2217-19 (2018), and conclude that the August 7 Order, requiring Zadeh's cell provider to turn over his historical location information without a proper warrant, violated the Fourth Amendment.

The Supreme Court of Maryland has explained that a court order may "function as a warrant for purposes of the Fourth Amendment" when sufficiently modified to conform to the Fourth Amendment's more exacting requirements. *State v. Copes*, 454 Md. 581, 625 (2017); *Whittington*, 474 Md. at 26-27 ("[C]ase law from the United States Supreme Court and this Court demonstrates no support for [the] formalistic contention that the use of another term besides 'warrant' categorically prevents compliance with the Fourth Amendment."). Recently, in *Richardson v. State*, the Supreme Court expounded that, to satisfy the Fourth Amendment's warrant requirements, the warrant (or warrant equivalent) "(1) must be based on probable cause; (2) must be supported by oath or affirmation; and (3) must describe with particularity 'the place to be searched, and the persons or things to be seized.'" 481 Md. 423, 450 (2022) (quoting U.S. CONST. AMEND. IV). The Court noted that it is especially "challenging for law enforcement agencies and courts to apply the particularity requirement in the digital world[.]" *Id.* at 453. We have explained that it is necessary that the warrant application be "based on sufficient information about the technology involved to allow a court to contour reasonable limitations on the scope and manner of the search[.]" *State v. Andrews*, 227 Md. App. 350, 413 (2016).

The August 7 Order was issued under CJP § 10-4A-04, which requires only that there be "reason to believe the contents of a wire or electronic communication, or the

32

records or other information sought are relevant to a legitimate law enforcement inquiry." CJP § 10-4A-04(d)(1).[12] As the Supreme Court explained in *Carpenter*—in interpreting a parallel provision in the federal Stored Communications Act requiring only a showing of relevance—that "showing falls well short of the probable cause required for a warrant." *Carpenter*, 138 S. Ct. at 2221. In the application for the August 7 Order, Det. Wolff explicitly referred to that lesser standard, certifying that "the location information likely to be obtained is relevant to the aforesaid ongoing criminal investigation[.]"

Beyond failing to meet the warrant requirements, the order in this case was also issued by a judicial officer without jurisdiction to do so. As we noted previously, the Stored Communications Act, specifically CJP § 10-4A-01(b)(12), provides that the term "[j]udge of competent jurisdiction" has the same meaning as stated in the Wiretap Act under CJP § 10-401. Under CJP § 10-401(12), a "'[j]udge of competent jurisdiction' means a judge of **any circuit court within the State** having jurisdiction over the offense under investigation." (Emphasis added). In 2016, the Maryland Attorney General issued an opinion confirming that the term "court of competent jurisdiction" as used in CJP § 10-4A-04, under which the order in this case was issued, has the same meaning (*i.e.*, a circuit court, *not* a district court). *See* Wiretap and Electronic Surveillance, 101 Md. Op. Att'y Gen. 61 (Md. A.G. Aug. 30, 2016). At bottom then, the order was void *ab initio* even if it otherwise satisfied the Fourth Amendment's warrant requirements. *See United States v.*

---

[12] In this section, we cite to CJP § 10-4A-04 as it existed at the time the order was sought in August 2014. *See supra*, note 3. What was then subsection(d)(1) is now subsection (c)(1).

*Krueger*, 809 F.3d 1109, 1123 (10th Cir. 2015) (Gorsuch, J., concurring) ("[A] warrant issued for a search or seizure beyond the territorial jurisdiction of a magistrate's powers under positive law was treated as no warrant at all—as *ultra vires* and *void ab initio* to use some of the law's favorite Latin phrases[.]"); *United States v. Master*, 614 F.3d 236, 239 (6th Cir. 2010) ("[W]hen a warrant is signed by someone who lacks the legal authority to issue search warrants, the warrant is void *ab initio*.").

We are not persuaded by the State's argument, relying on *Whittington*, that Zadeh's challenge to the August 7 Order addresses form over substance because the order met the constitutional requirements for a warrant pursuant to the safeguards established under CP § 1-203.1 (authorizing both district and circuit judges to issue an order authorizing or directing a law enforcement officer to use a cell site simulator or obtain location information from an electronic device upon a showing of probable cause, CP §§ 1-203.1(a)(3), (b)(1)). First, as we have already established, the August 7 Order was sought and issued under the Stored Communications Act—specifically CJP § 10-4A-04. Second, as Zadeh cogently argues, the State could not have obtained the August 7 Order under CP § 1-203.1 because that statute was not effective until October 1, 2014. 2014 Md. Laws Ch. 191 (S.B. 698). Here, of course, the operative order was issued on August 7, 2014, nearly two months prior to CP § 1-203.1 having legal effect.

Turning to whether officers acted in good faith in applying for and executing the order, we note that our standard of review is "an objective, rather than a subjective one[.]" *Connelly v. State*, 322 Md. 719, 728 (1991). Because "'the exclusionary rule was designed to deter police misconduct rather than to punish the errors of judges and magistrates[,]'"

34

*id.* (quoting *United States v. Leon*, 468 U.S. 897, 916 (1984)), when a court considers whether to suppress evidence, the question is whether the police "'acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment.'" *Id.* (quoting *Leon*, 468 U.S. at 918). Especially when, as here, there are no allegations of fraud or intentionally bad faith behavior, "application of the good faith exception to the allegations of the affidavit presents an objectively ascertainable question" within our province to decide. *Id.* at 735.

Zadeh urges that the good faith exception does not apply because, under *Illinois v. Krull*, 480 U.S. 340 (1987), evidence obtained by "an officer in reliance on a statute later deemed unconstitutional" may be admissible only where the officer satisfied the statute's "then-lawful requirements." *Krull*, however, involved a warrantless search of an automobile wrecking yard pursuant to a statute that authorized warrantless inspections of such facilities. *Id.* at 343. It was decided that the statute was unconstitutional because it failed to provide a constitutionally adequate substitute for a warrant by vesting too much discretion in inspecting officers to determine the time and manner of inspections, contrary to the safeguards required for constitutionally permissible administrative searches of highly regulated businesses. *Id.* at 346. Nevertheless, the Court concluded that extending the good faith exception to the exclusionary rule, as explicated in *United States v. Leon*, 468 U.S. 897 (1984),[13] was appropriate because application of the exclusionary rule to

---

[13] The *Leon* good faith exception applies to an officer's objectively reasonable reliance on a warrant later determined to be invalid. *Leon*, 468 U.S. at 920-21. As our Supreme Court has explained, the *Leon* exception does not apply in four specific situations: (1) "where the issuing authority is 'misled by information in an affidavit that the affiant

"evidence obtained by an officer acting in objectively reasonable reliance on a statute" would have little deterrent effect on future Fourth Amendment violations. *Id.* at 349-50. Applying that rationale, the Court determined that the good faith exception applied because the "defect in the statute was not sufficiently obvious so as to render a police officer's reliance upon the statute objectively unreasonable." *Id.* at 359.

Because this case turns on *both* the constitutional infirmity of obtaining historical CSLI data under the provisions of CJP § 10-4A-04 and the facial invalidity of the ensuing August 7 Order, our good faith analysis proceeds under both *Krull* and *Leon*. Specifically, we must determine: (1) under *Krull*, whether the relevant provisions of the Stored Communications Act were so patently unconstitutional that Det. Wolff could not have relied in good faith on the statute's validity; and (2) under *Leon*, whether the August 7 Order was so facially deficient as to preclude any reasonable reliance on the district court's issuance of the order. We answer "no" to both inquiries.

First, we underscore that the Supreme Court instructed in *Krull* that "application of the exclusionary rule to suppress evidence obtained by an officer acting in objectively reasonable reliance on a statute" does not serve the deterrent purposes of the exclusionary rule because "[u]nless a statute is clearly unconstitutional, an officer cannot be expected to

---

knew was false or would have known was false except for his reckless disregard for the truth'"; (2) "'where the issuing magistrate wholly abandoned his judicial role'"; (3) "where 'no reasonably well-trained officer should rely on the warrant . . . [such as] an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'"; and (4) where a warrant is "'so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.'" *Greenstreet v. State*, 392 Md. 652, 679 (2006) (quoting *Leon*, 468 U.S. at 923) (cleaned up).

question the judgment of the legislature that passed the law." *Krull*, 480 U.S. at 349-50. Thus, when a search is conducted under a statutory provision later determined to be unconstitutional, the resulting evidence will not be suppressed unless the statutory "provisions are such that a reasonable officer should have known that the statute was unconstitutional." *Id.* at 355. Here, we easily conclude that an officer in Det. Wolff's position could have reasonably relied on the validity of the Stored Communications Act at the time he applied for the August 7 Order. Above all else, the Stored Communications Act was never declared unconstitutional. And, as the Supreme Court of Maryland explained in *Copes*, at the time, "[m]ost courts ha[d] concluded that law enforcement access to *historical* CSLI [was] not a search for purposes of the Fourth Amendment" due to application of the third-party doctrine. *Copes v. State*, 454 Md. 581, 611 (2017) (emphasis added). Moreover, as the United States Court of Appeals for the Fifth Circuit recently observed, several federal courts have consistently concluded "that the good-faith exception—specifically, the *Krull* exception—applies to CSLI obtained" under the federal Stored Communications Act prior to *Carpenter*.[14] *United States v. Beverly*, 943 F.3d 225, 235-36 (5th Cir. 2019) (collecting cases).

---

[14] Zadeh argued below that because officers applied for a search warrant only four days later on August 11, 2014, they implicitly recognized that a warrant was required for the August 7 Order. We observe, however, that in the August 11 search warrant application, Det. Wolff sought not only CSLI data, but also the content of the text messages associated with that data. The record suggests, then, Det. Wolff obtained a *warrant* for this information under CJP § 10-4A-04(a) of the Stored Communications Act because the detectives were seeking the "content" of the communications, rather than just "record or other information." CJP § 10-4A-04(b)(1)(i); *see supra*, note 3.

Second, Zadeh posits that under *Krull*, the good faith exception cannot apply to the present situation because Det. Wolff failed to comply with the jurisdictional requirements of the Stored Communications Act. We do not read *Krull* as controlling in the manner that Zadeh suggests. As noted, the *Krull* Court held that the good faith exception to the exclusionary rule applies when an officer reasonably relies on the provisions of a statute that is later declared unconstitutional. The Court instructed that the exception does not apply, however, when the statutory "provisions are such that a reasonable officer should have known that the statute was unconstitutional." *Krull*, 480 U.S. at 355.[15] Here, although the Supreme Court in *Carpenter* determined that a warrant is required to obtain a person's historical CSLI, the Maryland Stored Communications Act has not been declared

---

[15] In Footnote 17, the Court declined "to recognize an exception for an officer who erroneously, but in good faith, believes he is acting *within the scope* of a statute" and suggested that the "answer to this question might well be different when police officers act outside the scope of a statute, albeit in good faith." *Krull*, 480 U.S. at 360 n.17 (emphasis added). In *Krull*, the inspecting officer "may have acted outside the scope of his statutory authority when he examined vehicles other than those listed" on the records falling within the scope of the statute. *Id.* at 345 n.5. The police action at issue in the present case, however, was the officer's mistaken understanding of which court was authorized to issue the order he sought and his subsequent reliance on the district court's determination that it possessed the authority to sign that order. In that sense, although Det. Wolff may have acted outside the scope of the statute by *presenting* the order to the district court, the more relevant actor here is the judge who *signed* the order. Since *Krull*, the Supreme Court has clarified that the "extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct" and that "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 143-44 (2009). We do not read *Krull* to mean exclusion is automatic when an officer, acting under a statute not obviously unconstitutional, mistakenly exceeds its scope. That is especially so in this case, where at least one Assistant State's Attorney and two judges were also mistaken. *See supra*, note 4.

unconstitutional. Applying the holding in *Krull*, therefore, we may conclude that it was reasonable for the officer in this case to rely on the Stored Communications Act, prior to *Carpenter*, to request an order for the CSLI from Zadeh's cell phone. Our analysis does not end here, however, as we must further determine whether Det. Wolff's lack of compliance with the jurisdictional requirements of the Stored Communications Act vitiates application of the good faith exception.[16] That question, in our view, is better examined under the *Leon* explication of the good faith exception, which focuses on the good faith of

---

[16] In *United States v. Warshak*, the United States Court of Appeals for the Sixth Circuit dealt with a similar issue under the federal Stored Communications Act. 631 F.3d 266, 281-83 (6th Cir. 2010). After concluding that the defendant's Fourth Amendment rights were violated when law enforcement obtained his emails without a warrant supported by probable cause, the court turned to the question of remedy and concluded that the good faith exception to the exclusionary rule applied. *Id.* at 284, 288-92. Specifically, applying *Krull*, the court explained that it could not agree that the federal Stored Communications Act was "so conspicuously unconstitutional as to preclude good-faith reliance" especially considering "the complicated thicket of issues that we were required to navigate when passing on the constitutionality of the SCA[.]" *Id.* at 289.

The court then confronted *Krull*'s Footnote 17 and accepted the premise that "an officer's failure to adhere to the boundaries of a given statute should preclude him from relying upon it in the face of a constitutional challenge" even if the Supreme Court's suggestion that the good faith exception might not apply when an officer acts outside the scope of a statute "was merely dicta." *Id.* at 289. Nonetheless, the court concluded that the actual statutory violations alleged in *Warshak—i.e.*, lack of required notice to the account holder and the prospective preservation of emails—did not vitiate application of the good faith exception because there was no causal connection between the statutory violations and the unconstitutional conduct. Specifically, as to the notice provisions, the court noted that the violations "occurred *after* the emails had been obtained" and therefore "had no bearing on the constitutional violations." *Id.* at 289-90 (emphasis in original). As to the preservation request, the court observed that "the actual violation at issue was obtaining the emails, and the government did not rely on [the preservation provisions] specifically to do that[,]" meaning that any violation thereof was ultimately of "no consequence" to the offending conduct. *Id.* at 290. Accordingly, the court concluded that "although the government violated the Fourth Amendment, the exclusionary rule does not apply, as the government relied in good faith on" the SCA's provisions authorizing the use of a subpoena and court order to obtain Warshak's emails. *Id.* at 292.

law enforcement in relying on a warrant later determined to be invalid. *Leon*, 468 U.S. at 920-21. Clearly, Zadeh focuses on the infirmity of *the order* rather than any inherent infirmity *in the statute*. As in *Leon*, then, we shall consider whether Det. Wolff's reliance on the validity of the August 7 Order was objectively unreasonable.

Along that vein, several of our sister courts have found that the *Leon* good faith exception "applies to warrants that are void *ab initio*[.]" *United States v. Werdene*, 883 F.3d 204, 216 (3d Cir. 2018). For example, in *United States v. Henderson*, the United States Court of Appeals for the Ninth Circuit explained that the good faith exception applied to a digital search warrant that was void *ab initio* because it authorized a "search outside of the issuing magistrate judge's territorial authority." 906 F.3d 1109, 1114 (9th Cir. 2018). The Court reasoned that "application of the good faith exception is permitted where a warrant is void because of a magistrate judge's jurisdictional violation, so long as the executing officers had an objectively reasonable belief that the warrant was valid" and the warrant was not so facially deficient as to negate the reasonableness of that belief. *Id.* at 1118-20.

Applying the same principles here, although it was later determined that the August 7 Order was not signed by a "court of competent jurisdiction," we fail to see how that deficiency would have been "readily apparent to a well-trained officer" or how suppression would "deter unlawful law enforcement behavior" in the future. *Whittington*, 246 Md. App. at 492. Indeed, the ambiguity in the statute as to the meaning of "court of competent jurisdiction" was sufficiently confusing among the bench and bar that the Maryland Attorney General had to issue an opinion explaining that "a court of competent jurisdiction

40

under . . . the stored communications statute means a circuit court." *See* 101 Md. Op. Att'y Gen. 61 (Md. A.G. Aug. 30, 2016). That being the case, we cannot agree that a reasonable officer in the position of Det. Wolff would have known that the August 7 Order was so facially deficient as to preclude any reasonable reliance upon it. Det. Wolff reasonably relied upon the district court's ultimately mistaken determination that it possessed the authority to issue the order.

In conclusion, although we determine that the historical CSLI data obtained by law enforcement under the August 7 Order constituted a violation of the Fourth Amendment under *Carpenter v. United States*, we hold that suppression of the CSLI data was not warranted because Det. Wolff acted in good faith. Accordingly, even though the trial court incorrectly denied Zadeh's motion under Rule 4-252(b), we conclude that the CSLI evidence was nevertheless admissible under the good faith exception to the exclusionary rule. We affirm, therefore, the circuit court's decision to deny Zadeh's motion to suppress.

## PART II:

### A. BACKGROUND

The following factual account is drawn from the evidence presented at Zadeh's second jury trial conducted over eight days between November 8 and November 18, 2021.

At approximately 12:26 p.m., on August 4, 2014, Sergeant Kirk Gilbert with the Takoma Park Police Department received a call reporting a "woman screaming" because "her husband was down in the back yard." When he arrived at the scene, 805 Colby Avenue, he was led to the backyard by some neighbors and the woman who lived there,

41

Larlane Pannell-Brown. Sgt. Gilbert observed the body of Cecil Brown laying near the shed in the backyard. Emergency Medical Services pronounced Brown dead at 12:36 p.m.

Detective Richard Poole arrived at the scene and interviewed Pannell-Brown in her house around 2:00 p.m. Pannell-Brown allowed Det. Poole to examine her cell phone wherein he noticed "a call from Ali at 6:41 a.m." Det. Poole handed Pannell-Brown's phone back to her and next interviewed Cecil "Beanie" Pannell, the son of Brown and Pannell-Brown. From that conversation, Det. Poole became aware of an alleged affair between Pannell-Brown and a younger man named "Ali," who worked at a nearby Enterprise Rental Car ("Enterprise") on New Hampshire Avenue.

### August 4, 2014, Interview with Zadeh

Det. Poole arrived at Enterprise around 5:30 p.m. and learned that "Ali" was an employee named Hussain Ali Zadeh who worked part-time cleaning rental cars. Det. Poole approached Zadeh and began asking him questions. Zadeh provided Det. Poole with his then-current address in Washington, D.C. and his phone number ending in 1365. When Det. Poole asked Zadeh "how he got to work that day," Zadeh stated that he took the "subway at Deanwood [station in D.C.] to Metro Center and bussed to Takoma Park" and arrived at work between 12:00 p.m. and 12:30 p.m., but he did not clock in until 2:00 p.m. Zadeh clarified that his commute "takes about 25 to 45 minutes[.]"

When Det. Poole asked Zadeh if he spoke to anyone earlier that morning, he replied that he "didn't talk to anyone before leaving home" and that "his phone [was] at home[.]" When asked specifically whether he had spoken to Pannell-Brown that morning, Zadeh initially claimed he could not remember. But then he recanted, saying he remembered

42

Pannell-Brown calling him that morning and saying, "Ali, my husband is dead." Zadeh told Det. Poole that he could not talk to Pannell-Brown at that time because he was driving. As Det. Poole continued to question him about Pannell-Brown, however, Zadeh clarified that he "details [Pannell-Brown's] car," but "really doesn't know her" and that she was "just helping him with his family."

Det. Poole testified that Zadeh said he didn't want to talk anymore and "refused to give me the cellphone number or let me look at [his] phone." When Det. Poole "went looking for the manager," Zadeh "re-initiate[d] the conversation saying that he really doesn't know [Pannell-Brown] or her family."

Next, after Det. Poole received information that Zadeh was operating a silver Jaguar, he sent Takoma Park Police Officer Jeff Demuth ("Off. Demuth") and his team to go to Zadeh's address in D.C. to look for the car. After Off. Demuth was unable to locate the Jaguar upon arriving at Zadeh's address, he knocked on the door and briefly spoke with Zadeh. He asked Zadeh whether he owned a silver Jaguar, to which Zadeh replied that "he didn't know anything about a Jaguar[.]" After Off. Demuth asked Zadeh about any calls he had with Pannell-Brown, Zadeh handed him his cell phone, whereupon Off. Demuth observed that "[t]he phone [] appeared to have been wiped clean[.]" When asked about the deleted data, Zadeh "grabbed the phone out of [Off. Demuth's] hand and stated that he didn't want anything to do with the investigation."

The next day, on August 5, 2014, Off. Demuth located the silver Jaguar "at a parking lot, in an apartment building down the street from [Zadeh's] employment." Off. Demuth and his team surveilled the Jaguar and "eventually saw Mr. Zadeh walk down the hill from

43

his employment . . . enter into the silver Jaguar and drive off." Off. Demuth then initiated a stop, seized the Jaguar as evidence, and told Zadeh "he was free to go after that."

### *Evidence Gathering*

Investigators learned from the CSLI data provided by Verizon that Zadeh's phone was in the area of Pannell-Brown's house at 805 Colby Avenue between 6:59 a.m. and 11:51 a.m. on August 4, 2014. Investigators noted two calls that were made on the morning of August 4: an outgoing call from Zadeh's phone to Pannell-Brown's phone at 6:40 a.m. and another outgoing call from Zadeh to Pannell-Brown at 6:41 a.m.

Cecil Brown had left his house around 5:30 a.m. that morning to go to a paving job about 40 minutes away in Jessup, Maryland. But the rain averted Brown from that work. James Langley, who worked with Brown, recalled that on August 4, 2014, Brown came into the office before 9:00 a.m. to get his paycheck, explaining that the "rain ruined his day, he had a list of chores to do at home."

The flash memory on the phones taken from Pannell-Brown revealed a series of text messages between Zadeh and Pannell-Brown on the day of the murder beginning at 11:09 a.m. Dion Morrow, a Verizon representative, testified that Pannell-Brown sent a text to Zadeh at 11:09 a.m. which read: "when I text you come outside." One minute later, Zadeh replied: "ok from what door??" Then, at 11:15 a.m., Pannell-Brown responded: "The bed room your friend name is bryan[,]" to which Zadeh replied, "ok got u LOL." Finally, at 11:16 a.m., Pannell-Brown texted Zadeh to "come now." The Browns' neighbor, Miranda Morris, also testified that the Browns kept "an enormous, not-trained pit bull" that "barked pretty ferociously" in their backyard that only Pannell-Brown or Brown could mollify.

44

Later, at 2:51 p.m., shortly after Pannell-Brown finished speaking with the detectives, she messaged Zadeh telling him: "Hey they check[ed] my phone."

On August 15, 2014, Det. Poole returned to 805 Colby Avenue with a search warrant. Among the items seized from Pannell-Brown's bedroom that day included (1) a handwritten note with the name "Ali" on it, (2) a birthday card that read, "you're the one I love. A keepsake from my heart to yours . . ." that was signed "love Rasta Ali", and (3) "Ali's folder" that contained, among other things, various applications for life insurance policies for Pannell-Brown listing Zadeh as the intended beneficiary.

### Financial Ties

Antonio Ferrari, a car salesman, testified that he sold a used Jaguar sedan to Pannell-Brown, who was accompanied by Zadeh, in January 2014. He explained that the total purchase price of the Jaguar was approximately $14,000. Angelia Cheeseboro, custodian of records for SunTrust Bank, confirmed that monthly payments for the Jaguar were drawn from Pannell-Brown's account starting in April 2014. Ms. Cheeseboro also testified that Pannell-Brown opened a joint account with Zadeh on June 16, 2014.

In December 2014, after the silver Jaguar was processed for evidence, Takoma Park Police contacted Pannell-Brown, who was the registered owner of the vehicle, requesting that she retrieve the Jaguar at the police station. Pannell-Brown arrived at the station with Zadeh, where they provided their drivers' licenses as identification; both drivers' licenses listed the same home address on Myrtle Avenue in Takoma Park.

In May 2015, Det. Poole arrived at the apartment on Myrtle Avenue to execute a search warrant and observed "a one-bedroom apartment" with "two people living there."

45

Det. Poole testified that the two occupants of the apartment were "Larlane Brown and Hussain Ali Zadeh." Among the items collected from the apartment included Zadeh's paystubs from Enterprise, a $100,000 AARP life insurance membership enrollment form dated June 17, 2014, for Pannell-Brown listing Zadeh as the beneficiary, and a purported handwritten will signed by Pannell-Brown leaving "all of my personal belongings, my property, and all my things I own in life" to Zadeh.

### *Medical Examiner*

The State introduced testimony suggesting that Pannell-Brown was not physically capable of beating her husband to death. Stephanie Dean, the medical examiner who performed Brown's autopsy, testified that Brown suffered blunt force trauma to the head inflicted with such force as to "cause tearing of the skin and fracturing of the skull." Dr. Dean clarified that the level of force necessary to cause that type of injury was "considerable" and would be consistent with the level of force generated by "motor vehicle collisions." Those closest to Pannell-Brown expressed skepticism that she would have been able to generate that type of force. Specifically, her daughter-in-law, Tahira Pannell, observed that Pannell-Brown "had a real bad sciatic nerve that would cause pain in her back" and prevented her from standing for too long. Beanie Pannell, her son, similarly described her as being "in bad shape physically" and incapable of lifting up her grandchildren to play or even to get up from a chair without assistance. He opined that there was "no way" that Pannell-Brown could have inflicted those injuries.

46

### *Defense Witnesses*

Zadeh called several witnesses to testify on his behalf, among them, George Ray, his former boss at Enterprise. Mr. Ray testified that Zadeh's typical working hours were from 2:00 p.m. to close of business, but that Zadeh would often show up early to work extra hours. After his recollection was refreshed with business records from August 4, 2014, Mr. Ray testified that Zadeh showed up to work early on August 4, 2014, specifically at 12:57 p.m. according to Enterprise's timesheet records for Zadeh. Mr. Ray explained that he never noticed anything unusual about Zadeh's appearance or demeanor around that time and that Zadeh worked his full shifts on each of the days following August 4, 2014.

Daniel Dyer, a building inspector with the Montgomery County Department of Permitting Services, explained that on August 4, 2014, he was performing an inspection of a remodeling project taking place at 807 Colby Avenue—the home next door to the Browns' residence. After consulting with records from that inspection, Mr. Dyer explained that he left another inspection nearby at 11:05 a.m. on August 4, drove to 807 Colby Avenue, and completed his inspection there at 11:35 a.m. Mr. Dyer testified that, he heard nothing unusual while he was at 807 Colby Avenue.

### *Verdict and Appeal*

On November 18, 2021, the jury reached its verdict, finding Zadeh guilty of second-degree murder. On February 1, 2022, the court proceeded to sentencing, and after hearing from both parties and the victim impact statements, sentenced Zadeh to 30 years of imprisonment with credit for time served. In an order docketed February 16, 2022, the court denied Zadeh's motion for a new trial, and on March 3, 2022, Zadeh noted an appeal.

47

**B. DISCUSSION**

**1.      VOLUNTARINESS  INSTRUCTION**

We open our discussion by delimiting the exact posture of the voluntariness instruction issue that is before us, as well as what is not before us. At trial, and over Zadeh's objection, the State played a recording of a lengthy discussion between Zadeh and two police officers who went to Zadeh's place of employment to execute a search warrant for Zadeh's DNA and cell phone on September 18, 2014. In response to many questions from the officers, Zadeh made several inculpatory statements, including contradictory and outright false statements regarding his whereabouts on the day of Brown's murder and his relationship with Pannell-Brown. Zadeh's motion to suppress these statements was denied. At trial, after the defense rested its case, Zadeh requested that the jury be instructed with a pattern instruction regarding the voluntariness of a defendant's statements to law enforcement. Zadeh's request was denied, and his objection was noted on the record. In closing, the State argued to the jury that Zadeh's statements showed consciousness of guilt.

The narrow question before us is whether the trial court erred in denying Zadeh's request for the voluntariness instruction. The merits of whether Zadeh's statements were voluntary or involuntary are not before us.

Our analysis, therefore, is shaped mainly by two overarching precepts: (1) that the jury (or factfinder) must determine the voluntariness of a defendant's statement to law enforcement if the issue is generated at trial; and (2) only "some evidence" of involuntariness is required to generate a voluntariness instruction.

First, the voluntariness of a defendant's statement is evaluated under Maryland's "two-tiered approach" articulated in *Hof v. State*, 337 Md. 581, 604 (1995).  The first step proceeds before the court and out of the presence of the jury, with the State bearing the burden of proving voluntariness by a preponderance of the evidence.[17] *See Hillard v. State*, 286 Md. 145, 151 (1979).  "Courts that are asked to determine at a suppression hearing whether a confession was made voluntarily must examine the totality of the circumstances affecting the interrogation and the confession." *Hill v. State*, 418 Md. 62, 75 (2011) (citing *Knight v. State*, 381 Md. 517, 532 (2004)).  If the statement is determined by the court to have been voluntarily given, the issue may proceed to the second tier where it is submitted at trial to the jury, which "has the final determination, irrespective of the court's preliminary decision, whether or not the confession is voluntary, and whether it should be believed." *Hof*, 337 Md. at 605 (quoting *Dempsey v. State*, 277 Md. 134, 143-44 (1976)).  The jury may use the statement in determining guilt, but only if the State persuades the jury of the voluntariness of the statement beyond a reasonable doubt.  *Id.* at 606 (citing *State v.*

---

[17] The State's burden of proving the voluntariness of a defendant's statements is normally discharged in three separate contexts in a criminal case.  First, at a motions hearing after the issue has been properly raised by a motion to suppress, the State must "prove voluntariness, by a preponderance of the evidence, under Maryland non-constitutional, common law—that is, that the statement was not caused by any improper promises or threats[.]"  ANDREW V. JEZIC, PATRICK L. WOODWARD, E. GREGORY WELLS, & KATHRYN GRILL GRAEFF, MARYLAND LAW OF CONFESSIONS §2:2 (2021-2022).  Second, if the State prevails before the suppression court on the common law, then the State may also need to prove, by a preponderance of the evidence, "constitutional voluntariness"—"that is, that the defendant's will was not overborne, under the totality of the circumstances, by coercive police conduct[.]"  *Id.* (footnote omitted). Third, if the voluntariness of the confession is generated as an issue at trial, then the State must prove the voluntariness of the statement beyond a reasonable doubt. *Id.* at 14-15 (footnote omitted).

49

*Kidd*, 281 Md. 32, 38 (1977)); *Hillard*, 286 Md. at 151. It is, therefore, a bedrock principle of our jurisprudence that "both the trial court and the jury must pass upon the voluntariness of a defendant's confession." *Hof*, 337 Md. at 604.

Second, for a defendant to receive a jury instruction on voluntariness, there must be "some evidence" of involuntariness presented during the trial. *Id.* at 619-20. Our cases stress that only *some evidence* is required, and thus the defendant's burden of production is not onerous:

> *Some evidence* is not strictured by the test of a specific standard. It calls for no more than what it says-"some," as that word is understood in common, everyday usage. It need not rise to the level of "beyond reasonable doubt" or "clear and convincing" or "preponderance." The source of the evidence is immaterial; it may emanate solely from the defendant. It is of no matter that the [involuntariness] claim is overwhelmed by evidence to the contrary.

*Dykes v. State*, 319 Md. 206, 216-17 (1990). With these principles in mind, we consider the relevant facts.

### a. Background

### *September 18, 2014*

As mentioned above, the State played at trial, over Zadeh's objection, the conversation that was recorded by Det. Poole when he and another officer returned to Enterprise to execute a search warrant on September 18, 2014. At the outset of the encounter, Det. Poole advised Zadeh that he was recording their discussion. On the recording, Det. Poole explained to Zadeh that he had a search and seizure warrant for cell phone(s) and his DNA, authorizing Det. Poole to take "saliva from inside of your mouth" and "seize any clothes[.]" Zadeh remarked, "I didn't do nothing" and Det. Poole replied:

50

"I understand that . . . but you're not under arrest, you understand?" After Det. Poole

repeated that Zadeh was not under arrest, Zadeh told the officers that he had nothing to say:

> [Zadeh]: And it's a murder and I got to live with this every day over top of my head because I am a friend of his mother's? That's crazy, man. That's crazy. Again, you come with this kind talk. I don't have nothing to say, man.
>
> [Det. Poole]: Uh-huh.
>
> [Zadeh]: I don't have nothing to say. . . .

Det. Poole responded by stating, "Listen to me. I would not be here if you would tell me

the truth." Zadeh then reiterated his claim that he only left for Takoma Park on the day of

the murder after watching TV at home "around about quarter after 12:00 or 12:30." A few

minutes later, Zadeh amended his statement to say that he *arrived in* Takoma Park

"between 12:00 and 12:30" but was at his home in the morning.

After confronting Zadeh about some of the inconsistencies in his prior statements

regarding Pannell-Brown and her family, Det. Poole said that, in addition to serving the

warrant, "I really wanted to have this opportunity to come and talk to you." Zadeh, for his

part, continued to attempt to distance himself from Pannell-Brown, stating that she was

"not my lover" and was simply a friend whose car he had serviced. Det. Poole then

mentioned that investigators found a birthday card from Zadeh to Pannell-Brown calling

her his "lover and friend[,]" to which Zadeh replied that there was no sexual relationship

between them. With respect to the Jaguar, Zadeh admitted, "I can't get a car in my name

because of my license situation[,]" and so Pannell-Brown offered to "pa[y] for it" with the

agreement that Zadeh pay her back.

51

As Zadeh continued to deny being near the area where Brown was murdered on the morning of August 4, Det. Poole interjected that Zadeh's phone "was in Takoma Park that morning, not at home like you said you were." Zadeh responded by bringing up his past encounters with the police, noting that he had been "beat by the police . . . for f***ing no reason, man." Specifically, Zadeh recalled one particular incident during which an unidentified police officer allegedly broke his nose "because he[] ask[ed] me something and I didn't want to f***ing tell him[.]" The conversation then steered back toward the notion that Zadeh had the opportunity to remove himself as a suspect. The second officer present explained that investigators were just "trying to make sense of, we want to make sense of this so that we don't have to talk to you all the time. We just want to get it all done and we don't have to come up and talk to you anymore. We won't be bothering you." The officer added that "we either want to prove that what you're saying [] is legit and you're not involved any more, or we got to, we got to do whatever we got to do[.]" Zadeh responded by accusing the officers of playing "mind games[,]" explaining that he was only talking because "if I didn't, it makes it look like I did something."

Det. Poole attempted to return to the issue of Zadeh's whereabouts on the morning of August 4, but Zadeh responded by explaining that he was "scared" and "not trying to f***ing go to jail" and that the officers had "to understand [his] stories with f***ing police, man" because the police made him afraid. He told the officers "I don't trust no police."

After further exchanges in which the officers elicited numerous untruthful statements by Zadeh in response to their questions—including that he "had no f***ing relationship" with Pannell-Brown but was going to meet her on the morning of August 4

52

to take her to a hair appointment—Det. Poole said, "Well, let's get this search warrant taken care of, man." Shortly after Det. Poole executed the search warrant by swabbing the inside of Zadeh's mouth, Zadeh said, "I need my lawyer" and then expressed frustration that he was being targeted. The colloquy continued.

Zadeh denied that he was living with Pannell-Brown at the time, exclaiming that he would not move in with her "even if I had nowhere to go." After Zadeh exclaimed that he no longer wanted to talk, the second officer said "you don't have to. It's up to you." Zadeh then asked the officers what they wanted him to say, to which the second officer replied that they wanted Zadeh to provide an explanation for why his phone was in Takoma Park on the morning of the murder. After Det. Poole determined Zadeh was not going to answer the question, he stopped the recording.

### *Motion to Suppress*

On December 18, 2020, Zadeh moved to suppress the statements he made to detectives on September 18, 2014, arguing that they were obtained in violation of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and were involuntary. On January 8, 2021, the State filed its opposition and argued, among other things, that the circuit court had already denied a motion to suppress raising the same issue prior to the first trial in 2016.[18] Following a hearing, the court denied Zadeh's motion to suppress.

---

[18] Prior to the first trial, on May 19, 2016, the circuit court denied Zadeh's motion to suppress his September 18, 2014, statements made to police. Zadeh alleged that the statements were involuntary "[u]nder the totality of all the circumstances" and "were the result of a custodial interrogation without a *Miranda* warning." The court ruled that "[i]t was a noncustodial interrogation. [Zadeh] wasn't under arrest. He was told he wasn't in custody. The officers were there to execute a search warrant. There was . . . some discussion

On November 18, 2021, at the close of the evidence, the parties gave closing

arguments, and the judge instructed the jury. The trial court declined Zadeh's request to

give the jury Maryland Criminal Pattern Jury Instruction 3:18, entitled "Statement of

Defendant." *See* MPJI-Cr. 3:18.[19] Defense counsel argued that "the totality of the

of an attorney, but there's no right to counsel, because [Zadeh] ha[d]n't been charged."
The court added that "the statement was voluntary. There was no *Miranda* requirement,
because there was no custody. So those statements are admissible." Zadeh does not raise
any claims under *Miranda v. Arizona*, 384 U.S. 436 (1966) in the current appeal.

[19] MPJI-CR 3:18 provides as follows:
You have heard evidence that the defendant made a statement to the police
about the crime charged. [You must first determine whether the defendant
made a statement. If you find that the defendant made a statement, then you
must decide whether the State has proven] [The State must prove] beyond a
reasonable doubt that the statement was voluntarily made. A voluntary
statement is one that under all circumstances was given freely.

[[To be voluntary, a statement must not have been compelled or obtained as
a result of any force, promise, threat, inducement or offer of reward. If you
decide that the police used [force] [a threat] [promise or inducement] [offer
of reward] in obtaining defendant's statement, then you must find that the
statement was involuntary and disregard it, unless the State has proven
beyond a reasonable doubt that the [force] [threat] [promise or inducement]
[offer of reward] did not, in any way, cause the defendant to make the
statement. If you do not exclude the statement for one of these reasons, you
then must decide whether it was voluntary under the circumstances.]]

In deciding whether the statement was voluntary, consider all of the
circumstances surrounding the statement, including: (1) the conversations, if
any, between the police and the defendant; (2) [whether the defendant was
advised of [his] [her] rights;] (3) the length of time that the defendant was
questioned; (4) who was present; (5) the mental and physical condition of the
defendant; (6) whether the defendant was subjected to force or threat of force
by the police; (7) the age, background, experience, education, character, and
intelligence of the defendant; [(8) whether the defendant was taken before a
district court commissioner without unnecessary delay following arrest and,

circumstances surrounding the . . . interrogation of Mr. Zadeh indicate that his statements were not voluntarily given." Defense counsel expanded:

> Under constitutional and due process principles in Maryland common law, the evidence at trial reflects Mr. Zadeh was subjected to a custodial interrogation when police confronted him with a search warrant for a buccal swab, and proceeded to interrogate him for 30 minutes before taking the swab, during which time Mr. Zadeh was not free to leave.
>
> The evidence at trial also established Mr. Zadeh's background and experiences are such that the intense questioning of him as a suspect was coercive under the circumstances. Mr. Zadeh's history of trauma from violence against him by police officers made the September 18th interrogation particularly threatening. Mr. Zadeh clearly felt compelled to speak with police, for fear of physical abuse were he to refuse, and even told the police that he was scared to answer their questions because in the past a police officer cracked him across the nose with a flashlight when he refused to answer the officer's questions.

Furthermore, defense counsel contended that Zadeh's statements were "involuntary because they were the product of certain improper threats, promises, or inducements by the police," particularly when police "promised Mr. Zadeh they would stop bothering him if he simply responded to their questions." The court disagreed, holding that the instruction was not generated because "this particular instruction is generated when there is, when a person is in custody, and there's evidence that there is force, promises, threats, inducements, or offer of reward, none of which was displayed in the testimony in this case, which is the reason why I've declined to give it."

---

if not, whether that affected the voluntariness of the statement;] (9) any other circumstances surrounding the taking of the statement.

If you find beyond a reasonable doubt that the statement was voluntary, give it such weight as you believe it deserves. If you do not find beyond a reasonable doubt that the statement was voluntary, you must disregard it.

55

*Closing Arguments*

During closing arguments, the State played six excerpts from the recording of Zadeh's September 18, 2014, statements to the police, arguing that "all of the lies of the defendant" were evidence of his "consciousness of guilt." In doing so, the State emphasized Zadeh's untruthful statements regarding: (1) Zadeh's denial of any sexual relationship with Pannell-Brown; (2) his denial that he moved into an apartment on Myrtle Avenue with Pannell-Brown; (3) Zadeh's denial that he was in the area of 805 Colby Ave on the day of Brown's murder; and (4) Zadeh's response that he "d[id]n't know" why his phone was near 805 Colby Ave on the morning of August 4, 2014, when confronted by Det. Poole. The State disputed that Zadeh was afraid of the police, insisting that "[f]ear [of the police] would be [] not talking to the police" and instead of refusing to speak, Zadeh "lies to the police." All of these lies, according to the State, were evidence of Zadeh's consciousness of guilt.

## b. The Parties' Contentions

Zadeh contends that the trial court erred by refusing to provide his requested jury instruction on the voluntariness of his statements. Specifically, Zadeh claims that more than sufficient evidence was presented to overcome "the low evidentiary bar" of the "some evidence" standard under Maryland common law to warrant an instruction. In particular, Zadeh contends that he produced "some evidence" of the involuntariness of his statements because "the police leveraged [his] fear of the police via a promise of investigative leniency." Additionally, Zadeh contends that the circuit court erred in its conclusion that "this particular instruction is generated when . . . a person is in custody, *and* there's

56

evidence that there [was] force, promises, threats, inducements, or offer of reward." (Emphasis supplied by Zadeh). Zadeh asserts that regardless of whether the evidence supported a "*per se* finding of involuntariness," an improper promise or inducement is not necessary under the totality of the circumstances. Zadeh also points out that the Notes on Use for Maryland Criminal Pattern Jury Instruction 3:18 refer to "pre-custodial settings."

The State counters that the trial court did not err in declining to give the jury instruction because "the facts on which Zadeh relies do not count as 'some evidence' of involuntariness under either" of the two applicable frameworks for assessing the voluntariness of a statement to police. The State urges that, under the first prong of the Maryland non-constitutional common law test, there was no evidence that the detectives made any threats, promises, or inducements to Zadeh when they came to his employment to execute the warrant. In the State's view, "there are no statements in the interview promising special consideration from law enforcement in exchange for a confession or statement from Zadeh, like a promise to vouch or a promise of prosecutorial leniency." (Internal quotation omitted). The State presses that there is also no evidence to satisfy the second prong of the common law test; namely, there was no evidence that Zadeh relied on any of the alleged inducements presented by the officers.

The State asserts next, citing *Hof v. State*, 337 Md. 581 (1995), that under the totality of the circumstances, Zadeh's suggestion that he was uniquely susceptible to police coercion does not establish the involuntariness of his statement. The State emphasizes that in *Hof,* the defendant's "longer and more coercive detention" was determined not to sufficiently generate MPJI-CR 3:18 because there was no "nexus" between the defendant's

57

general susceptibility to coercion as an addict and the exact statements at issue. Applying that rationale, the State contends that Zadeh's arguments that he was susceptible to coercion due to his fear of police would invite improper speculation.

Zadeh replies that the State improperly focuses on "the merits of whether [his] statement was, in fact, voluntary." Zadeh stresses that "is not the question before this Court" and reiterates that he was only required to present "some evidence" of the involuntariness of his statements. Turning to *Hof*, Zadeh asserts that the evidence was much stronger in the present case and included circumstances such as his clearly expressed disinclination to speak with police, his history of past violence and trauma with law enforcement, his request for a lawyer being ignored, the presence of multiple officers, and his practical inability to leave what became an interrogation. Zadeh concludes that the proposed instruction was easily generated by this evidence presented at trial.

### c. Overview of Law Governing Voluntariness

We review whether the trial court in this case "abused its discretion in refusing to offer a jury instruction under well-defined standards." *Cost v. State*, 417 Md. 360, 368 (2010). The court *must* give a requested instruction where "(1) the instruction is a correct statement of law; (2) the instruction is applicable to the facts of the case; and (3) the content of the instruction was not fairly covered elsewhere in instructions actually given." *Dickey v. State*, 404 Md. 187, 197-98 (2008). As we discuss next, when addressing a request for an instruction on voluntariness, the trial court must consider the principles of Maryland common law under both the *per se* rule and the totality of the circumstances (similar to federal constitutional voluntariness), as reflected in MPJI-CR 3:18. Whether "some

58

evidence" supports the delivery of a jury instruction is a question of law for the judge, which, in turn, we review without deference. *Holt v. State*, 236 Md. App. 604, 621 (2018).

### *Common Law and Constitutional Voluntariness*

Under Maryland common law, a statement is involuntary *per se* specifically "where 'it is the product of an improper threat, promise, or inducement by the police.'" *Madrid v. State*, 474 Md. 273, 317 (2021) (quoting *Lee v. State*, 418 Md. 136, 158 (2011)). That inquiry, first articulated in *Hillard v. State,* 286 Md. 145, 153 (1979), is governed by a two-part test under which it must be shown that "1) a police officer or an agent of the police force promise[d] or implie[d] to a suspect that he or she w[ould] be given special consideration from a prosecuting authority or some other form of assistance in exchange for the suspect's confession, and 2) the suspect makes a confession in apparent reliance on the police officer's statement." [20] *Winder v. State*, 362 Md. 275, 309 (2001). The first

---

[20] We recognize, of course, that Zadeh's statements in this case do not constitute the paradigmatic confession, but the parties do not raise this issue, nor do they challenge the trial court's pre-trial determination that Zadeh was not in custody (decided prior to Det. Poole's trial testimony that Zadeh was not free to leave).

The pattern jury instruction on voluntariness does not require that the jury find that the defendant made a confession, but rather simply, "that the defendant made a statement." MPJI-CR 3:18. The United States Supreme Court observed, in the related context of analyzing the admissibility of a defendant's statement under *Miranda*:

> . . . . no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.' If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, *statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication*. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement. *Miranda v. Arizona*, 384 U.S. 436, 476-77 (1966) (emphasis added).

prong of the *Hillard* test requires an objective analysis. Under the first prong, "the court must determine whether a reasonable person in the position of the accused would be moved to make an inculpatory statement upon hearing the officer's declaration; an accused's subjective belief that he will receive a benefit in exchange for a confession carries no weight under this prong." *Williams v. State*, 445 Md. 453, 478-79 (2015) (quoting *Hill v. State*, 418 Md. 62, 76-77 (2011)).

Overlying that more specific formulation—which constitutes a *per se* rule when an accused "alleges he was told that confessing would be to his advantage[,]" *Winder*, 362 Md. at 308—the voluntariness of a statement is examined under "the totality of the circumstances affecting the interrogation and confession[.]" *Smith v. State*, 220 Md. App. 256, 273 (2014) (quoting *Hill*, 418 Md. at 75). The Supreme Court has clarified that

> [m]any factors can bear on the voluntariness of a confession. As noted in *Winder v. State,* 362 Md. 275, 307, 765 A.2d 97, 114 (2001), we look to all elements of the interrogation, including the manner in which it was conducted, the number of officers present, and the age, education, and experience of the defendant. Not all of the multitude of factors that may bear on voluntariness are necessarily of equal weight, however. Some are transcendent and decisive. We have made clear, for example, that a confession that is preceded or accompanied by threats or a promise of advantage will be held involuntary, notwithstanding any other factors that

We also observe that, although the Maryland Supreme Court has not definitively held that the *per se* common law rule applies to non-custodial statements, it has ruled that a statement should have been suppressed as involuntary without mention of whether the defendant was in custody in *Hill*. 418 Md. at 71-72, 82. This Court, however, in *In re Joshua David C.*, has instructed that "[u]nder Maryland nonconstitutional or common law, the State must establish the voluntariness of a confession, even if a defendant is interrogated in a noncustodial setting." 116 Md. App. 580, 597 (1997). *See also* MPJI-CR 3:18, Notes on Use (providing that "*in pre-custodial settings*, the failure of police officers to advise a person of what rights he might have can be considered under the other factors[.]" (emphasis added)).

> may suggest voluntariness, unless the State can establish that such threats or promises in no way induced the confession.

*Williams v. State*, 375 Md. 404, 429 (2003);[21] *see also* MPJI-Cr 3:18 (delineating additional factors to consider as relevant to the circumstances of the particular case); *Hof*, 337 Md. at 596-97 (including other factors such as "whether the defendant was given Miranda warnings"; "the mental and physical condition of the defendant"; and whether the defendant was "physically intimidated or psychologically pressured").

The federal due process analysis,[22] also referred to as "constitutional voluntariness" or the "overborne will test," was described by the United States Supreme Court as,

> . . . an inquiry that examines "whether a defendant's will was overborne" by the circumstances surrounding the giving of a confession. [*Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)]. The due process test takes into consideration "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." [*Id.*] The determination "depends upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." *Stein v. New York*, 346 U.S. 156, 185 (1953).

---

[21] A much more comprehensive review of Maryland's decisional law is required to explain the evolution of the melding of the totality of the circumstances analysis with the *per se* rule under the Maryland non-constitutional common law analysis. *See, e.g.*, JEZIC, ET AL., MARYLAND LAW OF CONFESSIONS § 2:7 (2021-2022). The amalgamation was suggested by the Supreme Court in *Hof*, 337 Md. at 595-99, and fully explained in the above quote in *Williams*. 375 Md. at 429. In 2011, the Supreme Court adopted the *Williams* formulation as the controlling test in *Hill*. 418 Md. at 75-76.

[22] In *Lee v. State,* the Supreme Court of Maryland declared that the same "overborne will" test is applied to determine voluntariness under Article 22 of the Maryland Declaration of Rights. 418 Md. 136, 159 (2011); *see also Choi v. State*, 316 Md. 529, 535 n.3 (1989) (identifying that Article 22 usually provides the same protection against self-incrimination as the 5th Amendment and identifying exceptions to that general rule).

*Dickerson v. United States*, 530 U.S. 428, 434 (2000) (some citations omitted). In contrast to the common law analysis, an improper promise is just one of many factors under the due process analysis concerning whether a defendant's will was overborne. Ultimately, however, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

### d.     Instructing the Jury on Voluntariness

Having reviewed the foregoing principles governing the merits of an involuntary statement claim, we now center our analysis on law controlling when a court is required to instruct the jury on voluntariness. We reiterate that our analysis is shaped by two overarching precepts: (1) that the jury (or factfinder) must determine the voluntariness of a defendant's statement to law enforcement if the issue is generated at trial under Maryland's "two-tiered" approach; and (2) only "some evidence" of involuntariness is required to generate a voluntariness instruction. In other words, we consider the "some evidence" standard in conjunction with the precept that the jury "has the final determination, irrespective of the court's preliminary decision, whether or not the confession is voluntary, and whether it should be believed." *Hof*, 337 Md. at 604 (internal quotations omitted).[23]

---

[23] The *Hof* decision implies that a defendant may *always* be entitled to at least a limited instruction apprising the jury that they must find a defendant's statements voluntary beyond a reasonable doubt. Indeed, in *Hof*, the Supreme Court specifically held that "to merit a jury instruction on voluntariness, *one that does more than advise the jury that the State must prove voluntariness* . . . the issue must be generated before the jury." *Hof*, 337 Md. at 617 (emphasis added). To be sure, the *Hof* Court concluded that the proposed

In *Bellamy v. State*, for example, this Court explained that because a jury must "disregard the confession if they do not find it voluntary beyond a reasonable doubt[,]" general principles "as to the treatment and evaluation of evidence will not suffice with respect to the voluntariness of a confession." 50 Md. App. 65, 73 (1981). We emphasized that due to the "distinct nature of jury instructions relating to the voluntariness of a confession[,] . . . whenever a confession is introduced into evidence and instructions as to its voluntariness are requested, the trial judge must administer the proffered instruction regardless of his personal belief in the absence of evidence necessary to support the contention of involuntariness." *Id.*; *see also Dykes v. State*, 319 Md. 206, 224 (1990) (The Maryland Supreme Court has clarified that when the "trial judge resolves conflicts in the evidence, in the face of the 'some' evidence requirement, and refuses to instruct because he believes that the evidence supporting the request is incredible or too weak or overwhelmed by other evidence, he improperly assumes the jury's role as fact-finder.")

Still, a full instruction on voluntariness may be properly denied when it is not generated by the evidence presented at trial. *Hof*, 337 Md. at 618. In *Hof*, the Supreme Court concluded that an instruction beyond the one provided—which still apprised the jury that they must find the defendant's statement voluntary beyond a reasonable doubt—was not warranted. *Id.* at 620-21. At the pre-trial suppression hearing, the petitioner testified that he was suffering from addiction, was experiencing withdrawal symptoms and nausea

---

voluntariness instruction was not generated by the evidence presented at trial, but it also made sure to note that the instruction that the court "actually gave, requiring the jury to find the statement voluntary beyond a reasonable doubt, was sufficient." *Id.* at 621.

at the time of his interrogation, and that, after informing detectives of his physical state, he was promised that he would be taken to the hospital after he gave a statement. *Id.* at 587-88. The petitioner, however, did not reprise his testimony at trial. *Id.* at 588-89. Accordingly, in rejecting the petitioner's argument that his physical state left him uniquely susceptible to coercion, the Court explained that this issue was not generated at trial because, "[u]nlike at the suppression hearing, at which the petitioner testified to being nauseous and that he was promised that he would be taken to the hospital after he made his statement, there was no direct evidence of a nexus between the petitioner's drug usage and the statement he gave." *Id.* at 619. Because that evidence was not presented at trial, denying the instruction was warranted because, "even though the defendant may request a jury instruction on voluntariness, unless it has been generated by evidence, from whatever source, presented before the jury, the requested instruction need not be given." *Id.* at 618.

Returning to the present case, we are mindful that Zadeh fully preserved his claims under both the common law and the constitutional due process tests. To be sure, we agree with the State that in an abstract sense, the statements made by Det. Poole and the second officer present at the interview may not have risen to the level of a tangible threat or offer of leniency. Yet, as Zadeh ably points out, that does not end our inquiry because our analysis is ultimately guided by the totality of the circumstances in determining whether Zadeh produced "some evidence" that his statement was not voluntarily given. We fail to see how Zadeh fell short in that regard. Indeed, as was made apparent from the lengthy recording of the September 18 interview played for the jury at trial, the circumstances under which the interview was conducted provided "some evidence" that a person in Zadeh's

64

position, and with his background, would have felt compelled to continue talking to the officers—and continue to incriminate himself through falsehoods and inconsistencies.

Applying just a few of the factors bearing on the voluntariness of Zadeh's statements, we conclude that there was "some evidence" from which a jury *could* infer that Zadeh's statements were not freely and voluntarily given:

- **The Length of Questioning.** As indicated by the recording spanning nearly forty pages of trial transcript, Zadeh was subjected to a lengthy interview, the majority of which took place before Det. Poole acted to execute the search warrant.
- **The Manner of Questioning and Number of Officers Present.** Zadeh was questioned by two law enforcement officers who repeatedly asked him pointed questions, caught him in lies, and confronted him with contradictory evidence. Additionally, Zadeh repeatedly told the officers that he did not wish to speak with them both before and after the search warrant was executed. Finally, although perhaps not required, Zadeh was not Mirandized and his request for a lawyer was ignored. Because Zadeh was at work and functionally could not depart until the search warrant was executed, he was in some sense a captive audience. Even Det. Poole admitted on cross-examination that Zadeh "wasn't free to leave."
- **The Experience of the Suspect.** Zadeh repeatedly expressed his past traumatic experiences with law enforcement and his fear of speaking with police officers or being met with a violent response.

Considering the very low bar imposed by the "some evidence" standard, and the principle that it is within the province of the jury to determine whether a defendant's statement to law enforcement was voluntarily given, irrespective of the court's preliminary decision, we must conclude that the trial court abused its discretion by failing to give the requested pattern jury instruction, or as in *Covel v. State*, a modified voluntariness

65

instruction.[24]  *Covel v. State*, ___Md. App. ___ (2023), No. 1094, Sept. Term 2021, slip. op. at 6.  We conclude that Zadeh's requested instruction should have been given because "some evidence" was presented at trial sufficient to generate the instruction when viewed under the totality of the circumstances.  Here, the trial court focused instead on the first prong of the *Hillard* test, explaining that there must be "evidence that there is force, promises, threats, inducements, or offer of reward, none of which was displayed in the testimony in this case[.]"  Because the court failed to consider the totality of the circumstances, including whether the attendant circumstances under which the questioning was conducted were sufficient to generate the instruction, the court improperly removed the question of voluntariness from the jury's consideration despite "some evidence" from which a jury could infer that Zadeh's statements were not voluntarily given.

Finally, we must also conclude that the court's error in declining to instruct the jury as requested was not harmless beyond a reasonable doubt.  *Dorsey v. State*, 276 Md. 638,

---

[24] In *Covel*, the circuit court provided a modified instruction to the jury, which included, in pertinent part:

> You have heard evidence that the Defendant made a statement to the police about the crime charged.  The State must prove beyond a reasonable doubt that the statement was voluntarily made.  A voluntary statement is one that under all circumstances was freely given.  In deciding whether the statement was voluntary, consider all of the circumstances surrounding the statement . . . .
>
> If you find beyond a reasonable doubt that the statement was voluntary, give it such weight as you believe it deserves.  If you do not find beyond a reasonable doubt that the statement was voluntary, you must disregard it. *Covel v. State*, ___Md. App. ___ (2023), No. 1094, Sept. Term 2021, slip. op. at 6.

659 (1976). Here, without being properly instructed on the circumstances in which they could consider it, the jury was played a lengthy recording of an interview in which Zadeh repeatedly inculpated himself through inconsistent or false statements. In closing argument, the State used that evidence to bolster its circumstantial case against Zadeh, repeatedly referring to "all of the lies of the defendant" as evidence of his "consciousness of guilt." Thus, we cannot say that the court's failure to apprise the jury of its indispensable role in determining the voluntariness of Zadeh's statements in no way affected the verdict. Accordingly, the error is not harmless and we must reverse and remand for a new trial.

## 2. DOUBLE JEOPARDY

On December 7, 2020, Zadeh filed a motion "to dismiss the indictment pursuant to Md. Rule 4-252(d), Maryland common law, and the Double Jeopardy and Due Process Clauses of the Fifth Amendment," arguing, among other things, that collateral estoppel "bars the State from presenting evidence or argument regarding premeditation or conspiracy" at retrial because the jury acquitted Zadeh of those charges in the first trial. During the motions hearing on February 19, 2021, defense counsel reiterated their argument that the jury verdicts rendered in the first trial precluded the State from retrying Zadeh for second-degree murder because the majority of the State's evidence supported both premeditation and a conspiracy between Zadeh and Pannell-Brown—of which the jury specifically acquitted him. The State responded that Zadeh's motion should be denied because the same evidence relevant to prove first-degree murder and conspiracy to commit murder was also relevant to prove second-degree murder. The State contended that its theory in the first trial was not inconsistent with second-degree murder.

67

The court denied Zadeh's motion to dismiss, reasoning that,

> I think that . . . the Defense is . . . trying to equate . . . the inadmissibility of certain evidence that was allowed in the first trial in the second trial, as being equivalent of the basis for dismissing the charge. I think those two are two totally different issues. The fact that there might be some information presented in the first trial that may not be admissible in the second trial doesn't necessarily mean that this charge needs to be dismissed.
>
> I think that . . . **if there are some pieces of evidence that the Defense believes would not be admissible in the second trial, then that would be handled by way of a motion in limine to deal with evidentiary issues, and primarily would be based on relevancy.**

(Emphasis added). During the second trial, defense counsel objected to the State's introduction of certain pieces of evidence that, according to counsel, supported a conviction for premeditation and conspiracy instead of second-degree murder.

Before this Court, Zadeh contends, relying on *Ashe v. Swenson*, 397 U.S. 436 (1970), that the collateral estoppel component of the Fifth Amendment's Double Jeopardy Clause prohibited the State from presenting evidence that tended to establish premeditation or deliberation after he was found not guilty of first-degree murder and conspiracy in his first trial. Specifically, he objects to the admission of testimony suggesting that Pannell-Brown (1) distracted Brown and the couple's dog on the morning of the murder and (2) directed Zadeh to the backyard of the house by texting him to "come now."

The State's counter-argument builds on Justice Gorsuch's plurality opinion in *Currier v. Virginia*, 138 S. Ct. 2144 (2018), which the State construes as establishing that the Double Jeopardy Clause is only "concerned with the prosecution of the same act and crime, not with issue preclusion or the regulation of evidence." The State argues that, as

68

in *Currier*, it did not seek to retry Zadeh of the acquitted charges, but simply presented evidence relevant to the charge of second-degree murder.

Whether "principles of double jeopardy bar the retrial of [the defendant] is a question of law, and therefore we review the legal conclusion of the trial court *de novo.*" *Giddins v. State*, 393 Md. 1, 15 (2006) (citing *Bernadyn v. State*, 390 Md. 1, 8 (2005)). In *Ashe v. Swenson*, the Supreme Court of the United States determined that the Fifth Amendment's Double Jeopardy Clause contains a collateral estoppel element which "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated" in another trial on a separate charge. 397 U.S. 436, 443 (1970). In that case, the defendant had been acquitted of the robbery of one purported victim and was thereafter tried for "the same robbery" but of a different victim. *Id.* at 446. The Supreme Court concluded this was improper, noting that "after a jury determined by its verdict that the petitioner was not one of the robbers," the State could not constitutionally "hale him before a new jury to litigate that issue again" once that issue had been decided in his favor in the prior trial. *Id.* at 446-47.

More recently, in *Currier v. Virginia*, the Supreme Court attempted to clarify that the holding in *Ashe* only prevented re-litigation of an issue where it would be tantamount to re-litigation of the same offense. 138 S. Ct. 2144, 2149-50 (2018). Writing for a plurality of the Court, Justice Gorsuch explained that "the Clause speaks not about prohibiting the re-litigation of issues or evidence but offenses." *Id.* at 2152. Examining historical and modern practice, Justice Gorsuch pointed out that the "ultimate focus remains on the practical identity of offenses" considering that "the only available remedy

69

is the traditional double jeopardy bar against the retrial of the same offense—not a bar against the re-litigation of issues or evidence." *Id.* at 2153 (citing *Yeager v. United States*, 557 U.S. 110, 119-20 (2009)). Accordingly, the plurality emphasized that the Court "has never sought to regulate the retrial of issues or evidence in the name of the Double Jeopardy Clause[,]" and if a second trial is permissible, then "the admission of evidence at that trial is governed by normal evidentiary rules—not by the terms of the Double Jeopardy Clause." *Id.* at 2154. Justice Kennedy concurred in the judgment, finding that petitioner's double jeopardy challenge was waived by consenting to severance, but declining to join the plurality's re-examination of *Ashe*. *Id.* at 2156-57 (Kennedy, J., concurring).

In Maryland, our Supreme Court has recognized "the collateral estoppel form of double jeopardy as a part of Maryland common law." *Odum v. State*, 412 Md. 593, 606 (2010) (citing *State v. Long*, 405 Md. 527, 538 (2008)). In defining that principle, the Court has noted that the "critical question to be confronted when considering the proper invocation of the principles of collateral estoppel is 'whether an issue of ultimate fact has been previously determined in favor of the defendant.'" *Id.* (quoting *Long*, 405 Md. at 539). The defendant carries the burden of proving that the evidence which the defendant is seeking to bar in a subsequent case was necessarily decided in the defendant's favor in the prior proceeding. *Id.* Contrary to the plurality's suggestion in *Currier*, however, our jurisprudence seems to indicate that the doctrine of collateral estoppel "will apply to evidentiary facts" but only when "it appears substantially certain that a jury has already decided a fact essential to conviction in the accused's favor[.]" *Wise v. State*, 47 Md. App. 656, 664, 668-69 (1981) (citing *Powers v. State*, 285 Md. 269, 287 (1979)).

70

In *Wise*, we clarified that when considering a general verdict in the prior trial, "we must conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration[.]" *Id.* at 670. There, the appellant was acquitted of conspiracy to commit a separate murder in New York but was convicted of a murder committed in Baltimore which the State alleged to be connected as "contracts to kill." *Id.* at 657-60. On appeal from his murder conviction, appellant objected to "statements and allusions" by the State to the related conspiracy and contended that the acquittal "precluded the re-use of any evidence to show motive or premeditation and deliberation[.]" *Id.* at 670. We rejected appellant's argument, observing that the collateral estoppel principle did not reach that far. *Id.* We noted that "[t]he purpose of the evidence in the conspiracy cases was to prove the ultimate fact of a combination[,]" a finding which was "not essential either to the motive of appellant in killing the victims or to whether he deliberated upon it in advance." *Id.* Thus, while the factfinders in the two cases "were permitted to view and hear some of the same factual evidence, the 'ultimate fact' which they were to decide was entirely different[,]" rendering appellant's collateral estoppel challenge inapposite. *Id.* at 670-71.

Returning to Zadeh's case, to the extent that Maryland law and the Fifth Amendment's Double Jeopardy Clause permit a challenge to the re-litigation of an issue previously decided in favor of the defendant, Zadeh's claim falls short. Here, as in *Wise*, the ultimate fact to be decided by the jury in Zadeh's two trials was different. In the first trial, the evidence to which Zadeh now objects—specifically testimony suggesting that Pannell-Brown coordinated Zadeh's movements and texted Zadeh to "come now"—was

71

presented to establish the existence of an agreement with Pannell-Brown (with regard to the conspiracy charge) and premeditation (with respect to the first-degree murder charge) in killing Brown. Yet, under the circumstances of the second trial, that same evidence was also highly relevant to the charge of second-degree murder because it tended to show Zadeh's identity as the perpetrator of the offense by placing him at the scene of the crime, more specifically in the backyard of 805 Colby Avenue. Just because the evidence was relevant to the initial charges—of which Zadeh was acquitted—does not necessarily mean that the State was prohibited from presenting the same evidence in the second trial when it had obvious relevance to the charge of second-degree murder.

In *Wise*, we instructed that re-litigation of an issue is only proscribed when it is "substantially certain that a jury has *already* decided a fact essential to conviction in the accused's favor[.]" *Id.* at 664, 669 (emphasis added) (citations omitted). Although, in the first trial, the jury must have agreed that the facts presented did not rise to the level of establishing premeditation to kill, we underscore that Zadeh was also *convicted* of second-degree murder in the first trial. Thus, contrary to Zadeh's contentions, the jury in the first trial decided *against Zadeh*, presumably based in part on the challenged evidence which helped to place him at the scene of the crime, that he had in fact committed the murder of Brown or was an accomplice thereto. We therefore fail to see how the challenged evidence was "already decided . . . in the accused's favor." *Id.* Simply put, the evidence to which Zadeh now objects was relevant to the charge of second-degree murder, and the State was justified in presenting it to the jury at Zadeh's second trial.

### 3. SUFFICIENCY OF THE EVIDENCE

Finally, Zadeh asserts that the State's evidence was insufficient to prove second-degree murder beyond a reasonable doubt. Zadeh points to the fact there was no physical evidence or eyewitness that linked him to the scene and argues that "no rational trier of fact could have found beyond a reasonable doubt that Zadeh killed Mr. Brown" based only the CSLI data, the text messages, and the motive evidence showing a relationship between Zadeh and Pannell-Brown. The State responds that, viewing the evidence presented at trial in the light most favorable to the State, there was ample circumstantial evidence to sustain Zadeh's conviction for second-degree murder.

We must review Zadeh's challenge to the sufficiency of the evidence by viewing the evidence in the light most favorable to the prosecution and determining whether "*any rational trier of fact could have found all the elements of the offense beyond a reasonable doubt.*" *Davis v. State*, 100 Md. App. 369, 387 (1994) (emphasis in original) (citing *Wiggins v. State*, 324 Md. 551, 567 (1991)). "We defer to any possible reasonable inferences the jury could have drawn from the admitted evidence and need not decide whether the jury could have drawn other inferences from the evidence, refused to draw inferences, or whether we would have drawn different inferences from the evidence." *State v. Mayers*, 417 Md. 449, 466 (2010) (citing *State v. Smith*, 374 Md. 527, 557 (2003)).

Maryland courts have defined second-degree murder as embracing four paradigms: (1) killing a person with intent to kill, but without deliberation and premeditation; (2) killing a person with the intent to inflict such grievous bodily harm that death would likely result; (3) felony murder; and (4) depraved heart murder. *See Alston v. State*, 414 Md. 92,

73

109 n.5 (2010) (citing *Thornton v. State*, 397 Md. 704, 721-25 (2007)). In other words, second-degree murder "is the killing of another person without legal justification, excuse, or mitigation, and with either the intent to kill or the intent to inflict grievous bodily harm" and does not require premeditation or deliberation. *Banks v. State*, 92 Md. App. 422, 439 (1992) (citing *Tate v. State*, 236 Md. 312, 317 (1964)).

Viewing the evidence in the light most favorable to the State, we hold that the State presented sufficient evidence at trial for the jury to determine, beyond a reasonable doubt, that Zadeh (1) killed Brown "without legal justification, excuse, or mitigation" and (2) that Zadeh had "the intent to kill" Brown. *Id.* (citation omitted). Although the State's case-in-chief consisted entirely of circumstantial evidence, it is well established that "circumstantial evidence alone can provide a sufficient basis upon which a trier of fact can rest its determination of guilt[.]" *Pinkney v. State*, 151 Md. App. 311, 329 (2003). Here, the State presented ample circumstantial evidence from which a jury could infer that Zadeh had killed Brown.

As laid out in closing argument, the State's case against Zadeh consisted of three major themes suggesting his identity as Brown's killer: motive, opportunity, and ability.

As to the first theme, the State elicited testimony and documentary evidence underscoring Zadeh's romantic and financial relationship with Pannell-Brown. Both Tahira and Beanie Pannell testified that Pannell-Brown was having an affair. Those romantic ties were also corroborated by investigators at trial. Det. Michael Yu, for example, explained that he examined Pantech and ZTE phones associated with Pannell-Brown, each of which contained a contact for Zadeh's cell phone ending in 1365—saved

74

as "Ali Rasta 1 Love." Det. Yu detailed several romantic or sexually explicit text messages between Pannell-Brown and Zadeh.

Zadeh's financial dependency and entanglements with Pannell-Brown were also established by, among other things: the apartment that they lived in together after the murder; the used Jaguar sedan that Pannell-Brown purchased for Zadeh; the joint account she opened with Zadeh on June 16, 2014; the membership enrollment form for a life insurance policy with Zadeh listed as the beneficiary; and certainly, Pannell-Brown's purported will leaving her entire estate to Zadeh.

Second, as to opportunity, the State placed Zadeh at the scene of Brown's murder through the CSLI data recovered from Verizon, as explained through the expert testimony of FBI Agent Richard Fennern, and through the testimony of Verizon representative Dion Morrow, who detailed a series of text messages, as well as two phone calls between Pannell-Brown and Zadeh on the morning of Brown's murder, suggesting that he was inside 805 Colby Avenue at the time.

Third, in regard to ability, Tahira and Beanie Pannell testified that Pannell-Brown was not physically capable of beating Brown to death according to the amount of force that was required, as related by the medical examiner who performed Brown's autopsy. The medical examiner testified that Brown suffered blunt force trauma to the head inflicted with such force as to "cause tearing of the skin and fracturing of the skull." Dr. Dean clarified that the level of force necessary to cause that type of injury was "considerable" and would be consistent with the level of force generated by "motor vehicle collisions." Zadeh, by contrast, was described as being "in very good shape" and "very muscular."

75

From the evidence presented at trial, a reasonable juror could certainly infer that Zadeh (1) had the motive to kill Brown based on his financial and romantic ties to Pannell-Brown, (2) had the opportunity to do so based on circumstantial evidence of his physical presence at the scene of the crime, and (3) was the only person between himself and Pannell-Brown with the physical ability to have inflicted the fatal wounds. In addition to that evidence, the jury was presented with extensive evidence, apart from the September 18, 2014 interview, of Zadeh's inconsistent or blatantly false statements to law enforcement as evidence of consciousness of guilt. Under those circumstances, we cannot say that the State did not provide sufficient evidence from which "*any* rational trier of fact could have found all the elements of the offense beyond a reasonable doubt." *Davis*, 100 Md. App. at 387 (emphasis in original).

> **JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY MONTGOMERY COUNTY.**